UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PENNENVIRONMENT and<br>SIERRA CLUB,<br><br>        Plaintiffs,<br><br>v.<br><br>RELIANT ENERGY, INC. and<br>RELIANT ENERGY NORTHEAST<br>MANAGEMENT COMPANY,<br><br>        Defendants. | Civil Action No.:  07-00475 |

## <u>MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS</u>

Thomas Farrell (PA ID No. 48976)
Farrell, Reisinger & Stallings, LLC
1000 Koppers Building
436 7th Avenue
Pittsburgh, Pennsylvania 15219-1827
(412) 894-1380 (phone)
(412) 894-1381 (fax)

Joshua R. Kratka (MA ID No. 544792)
Theresa Labriola (MA ID No. 662262)
National Environmental Law Center
44 Winter Street, 4th Floor
Boston, Massachusetts  02108
(617) 747-4333 (phone)
(617) 292-8057 (fax)

April 30, 2009

*Counsel for Plaintiffs PennEnvironment
and Sierra Club*

## TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

STATEMENT OF FACTS............................................................................................2

  Reliant's Discharges of Metals Are Subject to
  Water Quality-Based Effluent Limitations. ............................................................2

  Reliant's Wastewater Discharges
  Pollute a River That is Already Impaired. .............................................................5

  DEP Has Not Modified or Enforced
  the 2001 Permit Limits at Issue Here.....................................................................8

  Plaintiffs Are Harmed by Reliant's Permit Violations.........................................11

ARGUMENT ................................................................................................................12

  I.   SECTION 309(g)(6) OF THE CLEAN WATER ACT DOES NOT DEPRIVE THIS
      COURT OF JURISDICTION. ......................................................................12

     A.  CITIZEN ENFORCEMENT SUITS ARE TO BE ENCOURAGED UNDER
        THE CLEAN WATER ACT. ......................................................................13

     B.  BY ITS PLAIN TERMS, SECTION 309(g)(6) ONLY BARS FEDERAL COURT
        PENALTY ACTIONS WHEN AN AGENCY IMPOSES ADMINISTRATIVE
        PENALTIES FOR THE SAME VIOLATIONS OF THE ACT. .........................15

     C.  THE COA DID NOT SEEK OR IMPOSE AN ADMINISTRATIVE PENALTY.
        ........................................................................................................21

     D.  EVEN IF THE COA HAD BEEN ISSUED UNDER PENNSYLVANIA'S
        ADMINISTRATIVE PENALTY LAW, THAT LAW IS NOT
        "COMPARABLE" TO SECTION 309(g)(6). ...............................................23

     E.  EVEN IF THE COA WERE A COMPLIANCE ORDER, AND EVEN IF
        COMPLIANCE ORDERS HAD PRECLUSIVE EFFECT, SECTION
        309(g)(6)(A) WOULD BE INAPPLICABLE BECAUSE DEP HAS NOT
        "DILIGENTLY PROSECUTED" THE VIOLATIONS AT ISSUE IN THIS
        SUIT. ....................................................................................................25

     F.  EVEN IF SECTION 309(g)(6) WERE APPLICABLE, IT WOULD ONLY
        PRECLUDE PLAINTIFFS' PENALTY CLAIMS. ..............................................27

**II. PLANTIFFS HAVE STANDING TO BRING THIS ACTION.** .................................**28**

    **A.  PLAINTIFFS HAVE SUFFERED INJURY IN FACT**...........................................**29**

    **B.  PLAINTIFFS' INJURIES ARE TRACEABLE TO RELIANT'S CLEAN WATER ACT VIOLATIONS.** .............................................................**33**

    **C.  THIS COURT CAN REDRESS PLAINTIFFS' INJURIES**.................................**34**

    **D.  THE PLAINTIFF ORGANIZATIONS HAVE STANDING TO SUE ON BEHALF OF THEIR MEMBERS.** .......................................................**36**

**CONCLUSION** ....................................................................................................**37**

**INTRODUCTION**

The Conemaugh River is on the Commonwealth of Pennsylvania's List of Impaired Waters because it has excessive concentrations of various metals.  Since the day its new and long-anticipated wastewater discharge limits took effect in February 2005, Defendant Reliant Energy Northeast Management Company[1] ("Reliant" or "Defendant") has consistently discharged illegal levels of five different metals, one of which is classified as a toxic pollutant, into the Conemaugh River from the Conemaugh Generating Station, a large coal-fired power plant in West Wheatfield Township.  In addition, for three years it was impossible to determine whether Reliant was also discharging illegal levels of a sixth metal – mercury, also a toxic pollutant – because the company refused to use a sufficiently sensitive monitoring test, also in violation of its wastewater discharge permit.

Reliant had known since the 1990s that it would be required to reduce the concentrations of metals in its wastewater.  But instead of upgrading its treatment systems to reduce its pollutant discharges, Reliant focused its resources on challenging its permit limits and warding off agency enforcement.  Now it attempts to avoid citizen suit enforcement as well, by raising two inapplicable jurisdictional defenses.

Neither the Pennsylvania Department of Environmental Protection ("DEP") nor the U.S. Environmental Protection Agency ("EPA") is prosecuting a judicial action to enforce the terms of Reliant's wastewater discharge permit.  Accordingly, section 505 of the federal Clean Water Act (the "CWA" or "the Act"), 33 U.S.C. § 1365, gives this Court jurisdiction over this suit to secure compliance.  Further, since neither agency has levied an administrative penalty against Reliant for any of the permit violations that are the subject of this action, this Court has jurisdiction to impose civil penalties under section 309(d) of the Act, 33 U.S.C. § 1319(d), as well as appropriate injunctive relief.  See 33 U.S.C. § 1365(a).

---

[1] On April 13, 2009, the parties entered a stipulation of voluntary dismissal of Defendant Reliant Energy, Inc.

PennEnvironment and Sierra Club ("Plaintiffs") filed this federal enforcement suit on behalf of their individual members, who unquestionably have standing to seek enforcement of Reliant's permit because they live near and use the Conemaugh River downstream of the Conemaugh Generating Station and are harmed by its illegal discharges. Plaintiffs ultimately seek an order that will compel Reliant to comply with its permit and pay an appropriate penalty for its violations.

## STATEMENT OF FACTS

**Reliant's Discharges of Metals Are Subject to**
**Water Quality-Based Effluent Limitations.**

Dischargers of industrial wastewater, such as Reliant, must comply with permits issued under the National Pollutant Discharge Elimination System ("NPDES"), a federal program established in section 402 of the CWA, 33 U.S.C. § 1342. In Pennsylvania, the NPDES program is administered by DEP, subject to the oversight and ultimate authority of EPA. See 35 PA. CONS. STAT. § 691.307(a). NPDES wastewater discharge permits are required by federal law to conform to a set of specified criteria. Such permits typically contain limits on the discharge of pollutants and monitoring requirements designed to measure compliance with those limits. Section 301(a) of the CWA, 33 U.S.C. § 1311(a), and section 691.301 of the Pennsylvania Clean Streams Law, 35 PA. CONS. STAT. § 691.301, prohibit the discharge of pollutants in violation of an NPDES permit.

As Reliant admitted in its Memorandum in Support of Motion to Dismiss ("Def. Mem.") and supporting declarations, the Conemaugh Generating Station ("CGS" or "the Facility") removes water from the Conemaugh River for, among other purposes, use in the Facility's cooling towers and in its wet flue gas desulfurization ("FGD") scrubber. Def. Mem. at 3; Declaration of Rich Beer in Support of Motion to Dismiss ("Beer Dec.") (Def. Ex. 1), ¶¶ 3-4. Some of this intake water is eventually discharged back into the river as wastewater. This enforcement action concerns Reliant's outfall 003, which discharges approximately 2.8 million gallons per day of "cooling tower blowdown," and outfall 007, which discharges approximately

2

350,000 gallons per day of wastewater from various sources, including the FGD scrubber.  2006

NPDES Permit Renewal Application (attached as Plaintiffs' Exhibit 1 ("Pl. Ex. 1") to the

accompanying Declaration of Joshua R. Kratka ("Kratka Dec.") in Support of Plaintiffs'

Memorandum in Opposition to Motion to Dismiss).  These discharges are subject to effluent

standards and limitations contained in NPDES Permit No. PA005011 ("2001 Permit") (Def. Ex.

9).[2]

       Wastewater discharges from the Conemaugh Generating Station must comply with

national "technology-based" effluent limitations, set by EPA, which represent the minimum

degree of pollution removal that must be achieved by all similar facilities across the country.  33

U.S.C. § 1311(b)(1)(A); 40 C.F.R. §§ 125.3 & 423; 25 PA. CODE § 92.2(d).  In addition, because

more stringent effluent limitations are required to enable the Conemaugh River to meet state

water quality standards, "water quality-based" effluent limitations ("WQBELs") are also

included in Reliant's NPDES permit, as is required by federal and state law.  See 33 U.S.C. §

1311(b)(1)(C); 40 C.F.R. § 122.44(d); 25 PA. CODE § 96.4(b), (f).

       The Conemaugh River is on Pennsylvania's List of Impaired Waters, a list created

pursuant to section 303(d) of the CWA, 33 U.S.C. § 1313(d).  See Pl. Ex. 2.  DEP placed the

Conemaugh River on this list because excessive levels of metals prevent the river from meeting

state water quality standards.  Id.

       At least as early as 1993, Reliant (or its corporate predecessor) was on notice that

discharges from outfalls 003 and 007 would be subject to these more stringent WQBELs for

various pollutants of concern, including the metals aluminum, iron, manganese, selenium, and

mercury.  See 1993 NPDES Permit No. PA005011 (Pl. Ex. 3), at 14e-14g; 1993 Fact

Sheet/Statement of Basis ("1993 Fact Sheet") (Pl. Ex. 4), at 6-7.  At that time, DEP specifically

noted that "the improving condition of the Conemaugh River … around the [Conemaugh

Generating] station now supports an aquatic community which needs to be protected," and

---

[2] The 2001 Permit was amended in 2004, but none of the effluent standards or limitations at issue in this case was affected by the amendment.  See Def. Ex. 3 and discussion at p. 8, below.

advised the company to conduct additional sampling to "confirm model parameters such as stream width, depth, velocity, etc."  1993 Fact Sheet (Pl. Ex. 4), at 7.

As long ago as 1997, Reliant's corporate predecessor knew that "Conemaugh Station [was] not even close to complying with WQBELs" and that "significant treatment will be required."  Memorandum – Meeting Minutes/Conemaugh Stream Survey, GPU Generation, Inc. (Apr. 7, 1997) (Pl. Ex. 5), at REL00133009.  Selenium and mercury are classified by EPA as toxic pollutants.  See 40 C.F.R. § 401.15.

Reliant's predecessor subsequently "collected site specific data to be used [] in the water-[quality] based effluent limitation calculations," and DEP used the company's data in developing the WQBELs it eventually included in the 2001 Permit.[3]  2001 Fact Sheet/Statement of Basis ("2001 Fact Sheet") (Pl. Ex. 6), at 4.  Despite this eight-year lead time, the 2001 Permit nevertheless provided Reliant three additional years – from the permit's February 1, 2002 effective date until February 1, 2005 – in which to perform any additional sampling and alternative modeling and to make any needed upgrades to its wastewater treatment systems before the WQBELs actually took effect.  See id.; 2001 Permit (Def. Ex. 9), at 2c-2f, 2q-2t.

Reliant's WQBELs are "concentration-based" limits, expressed in milligrams of pollutant per liter of wastewater ("mg/l"), set at levels designed to ensure that the Facility's discharge is not "inimical or harmful to the water uses to be protected or to human, animal, plant or aquatic life."  25 PA. CODE § 93.6(a); 25 PA. CODE § 93.8a(a).  Water quality standards and effluent limitations are frequently expressed in terms of concentration limits because, in many situations, the amount of the pollutant present *in a given unit of wastewater* – as opposed to the overall amount of the pollutant discharged – is the critical factor in assessing potential impacts on aquatic life or human health.  See, e.g., 25 PA. CODE § 93.7 (listing state water quality standards, most of which are expressed in terms of mg/l).

---

[3] This refutes Reliant's unsupported assertion that DEP developed these limits "using generic and conservative models that did not represent actual conditions in the Conemaugh River."  Teitt Dec. (Def. Ex. 2) ¶ 8.

The permit itself makes clear that compliance with the WQBELs is mandatory:  "It shall not be a defense for the permittee in an enforcement action that it would have been necessary to halt or reduce the permitted activity in order to maintain compliance with the conditions of this permit."  Amended 2001 Permit (Def. Ex. 3), Part B, at 12.

**Reliant's Wastewater Discharges**
**Pollute a River That is Already Impaired.**

Reliant's surprising claim that it actually *cleans* the Conemaugh River, by passing river water through a large coal-burning power plant and then discharging the resultant wastewater back into the river, is as false in fact as it is absurd on its face.[4]  See Def. Mem. at 4, 34, 36; Teitt Dec. (Def. Ex. 2) ¶¶ 2-3.  Simply put, wastewater discharged from the Conemaugh Generating Station pollutes the Conemaugh River.  If Reliant were to comply with its NPDES permit limits, the plant would still pollute the river, but to a lesser degree.

The clearest evidence of Reliant's pollution is the company's own monitoring data.[5]  Between February 2005 and September 2008, Reliant reported more than 400 instances in which wastewater it discharged to the Conemaugh River from outfall 003 or outfall 007 contained selenium, boron, iron, manganese, or aluminum in concentrations that exceeded a water quality-based effluent limit specified in the 2001 Permit.  See Kratka Dec. ¶¶ 11-12 and Pl Exs. 7 & 8.

Nonetheless, Reliant claims that it returns a net benefit to the river even as it routinely violates these limits, arguing that there are more pounds of pollutants in its intake water than in

---

[4] Reliant made this very argument to DEP, without success.  In its comments on the draft 2001 Permit and then in its Notice of Appeal of the 2001 Permit, Reliant argued that DEP had no authority to impose water quality-based effluent limits on discharges of metals from outfalls 003, 004, and 007 because there are "more metals" in the Facility's intake water, on a mass basis, than in its final discharges.  2001 Fact Sheet (Pl. Ex. 6), at 14; Notice of Appeal (Def. Ex. 10), at 9-10.  DEP flatly rejected this argument, and made no change to the 2001 Permit's WQBELs for any of the metals that are at issue in this case.

[5] The Clean Water Act and its implementing regulations contain provisions ensuring the reliability of effluent monitoring data.  See 33 U.S.C. § 1318(a); 40 C.F.R. § 122.22.  Reliant's monthly discharge monitoring reports are submitted under penalty of perjury.  See Responses to Plaintiffs' First Request for Admissions ("Def. RFA Resp.") (Pl. Ex. 8), No. 3.

its effluent.  Def. Mem. at 4.  But because there is simply more intake water than effluent – and because Reliant's discharge limits are concentration-based, not mass-based – Reliant's claim appears to be intentionally misleading.

As a preliminary matter, the Court should accord no weight to Reliant's "net reduction" analysis.  Not only is it based on unqualified "expert" testimony,[6] but it is riddled with uncertainties.  Reliant presents a chart based on compilations and extrapolations of selected intake and effluent data.  See, e.g., Teitt Dec. (Def. Ex. 2) ¶¶ 4.c, 5.d ("conversion factors were applied"), ¶¶ 4.b, 5.b-c ("detection limits" were used "to estimate mass").  Yet Reliant fails to (a) present the underlying data, (b) detail how or when such data was collected, or (c) justify why the particular data samples and the time span(s) over which they were collected should be considered representative of either in-stream conditions or Reliant's effluent.[7]  Further, Reliant fails to set forth the methods employed to extrapolate the numbers in Mr. Teitt's declaration from the underlying data.  In short, there has been no showing that Reliant's methodology – from data selection, to "conversion factors," to the final numbers presented, to the person or persons who performed the analysis – is reliable.

Second, EPA 25 years ago squarely rejected the notion that "simple subtraction of intake [water] pollutant values from effluent values" is a valid consideration when "setting [or] measuring compliance" with discharge limits.  NPDES Permit Regulations, 49 Fed. Reg. 37,998, 38,026 (Sept. 26, 1984) (Pl. Ex. 10).  Thus, while "a permit writer may take into account the presence of intake water pollutants" in setting water quality-based permit limitations, the limits

---

[6] By consciously employing the language of Daubert to describe its analysis, Reliant impliedly acknowledges that this is the type of evidence that is properly the subject of expert testimony.  See Teitt Dec. (Def. Ex. 2) ¶ 2 (the "analysis was performed using analytical and computational methods that are considered reliable in the field of environmental science").  Yet Mr. Teitt does not provide his qualifications for conducting such an analysis.  Indeed, since he himself did not even perform the analysis – it was conducted "[u]nder my direction and supervision," id. – Reliant is attempting to introduce expert testimony from persons unknown.

[7] Indeed, Reliant came up with a completely different set of numbers during an earlier attempt to perform such a "net reduction" analysis.  See chart entitled "Attachment 6:  Summary of 2000 Toxics Survey Study – and Discharge Metals (lbs/year)" (Pl. Ex. 9).

6

established "must be adequate to meet the water quality objectives of the Clean Water Act." Id. at 38,027. Consistent with these federal guidelines, DEP was required to – and did – take into account background levels of pollutants in the Conemaugh River when setting Reliant's WQBELs. See 25 PA. CODE § 96.3(e); 2001 Fact Sheet (Pl. Ex. 6), at 4 (site-specific data were "used in PENTOXSD," a modeling program employed by DEP in establishing WQBELs). Reliant cannot now claim that a violation of those limits is of no consequence.[8]

Third, Reliant's "net reduction" analysis shows that the Facility discharges more selenium and boron into the river than it takes out. Reliant's claim of "cleaning" the river thus is, by its own terms, inapplicable to these two pollutants.

Fourth, Reliant's "net reduction" analysis with respect to aluminum, iron, manganese, and other metals is highly misleading because it omits, or hides, a crucial factor: the significant net reduction of *water* that also occurs. See Teitt Dec. (Def. Ex. 2) ¶ 3. At this stage of the litigation, Plaintiffs have not hired an expert to quantify the amount of water released as steam that can be seen billowing out of the cooling towers and scrubber from miles away, or to calculate how much water is "lost" in other ways from Reliant's wastewater stream. But a document submitted by Reliant during its deposition of one of Plaintiffs' members indicates that the Conemaugh Generating Station discharges back into the river approximately 88.5% less water than it takes out.[9] This reduction in water volume is greater than Reliant's claimed net

---

[8] To the extent Reliant is attempting to use its "net reduction" analysis to challenge its NPDES permit limits, that ship has long since sailed. A discharger has a specified period within which to challenge the terms of its permit, and it may not do so in a later enforcement action. See Public Interest Research Group ("PIRG") of N.J. v. Powell Duffryn Terminals Inc., 913 F.2d 64, 78 (3d Cir. 1990).

[9] Exhibit 2 to the Deposition of Kurt Limbach and attached here as Pl. Ex. 9 is a chart similar to the one in paragraph 3 of the Teitt Declaration. But it contains a key element missing from the Teitt Declaration: in addition to pollutant intake and discharge data, it also lists *water* intake and outflow. The amount of Conemaugh River intake water is listed as approximately 52.8 billion pounds, while the amount of water discharged from outfalls 003, 004, and 007 combined is only approximately 6.1 billion pounds. This is a "net reduction" of approximately 88.5%. Admittedly, because this document lacks proper foundation, see Limbach Dep. (Def. Ex. 6), at 37-41, it suffers from the same defects as paragraphs 2 through 5 of the Teitt Declaration. But to

reduction of aluminum (82%), iron (76%), or manganese (76%).  <u>See</u> Def. Mem. at 4.  It is therefore not surprising that the *concentration* of these metals in Reliant's effluent is greater than their concentration in the intake water from the river, and that Reliant's discharge thus increases the concentration of these metals in the river.

**DEP Has Not Modified or Enforced**
**the 2001 Permit Limits at Issue Here.**

On January 31, 2002, Reliant appealed the 2001 Permit to the Pennsylvania Environmental Hearing Board.  Def. Ex. 10.  On December 18, 2004, DEP published a notice in the Pennsylvania Bulletin stating that it was "amending [Reliant's] NPDES permit in response to a settlement agreement (Consent Order and Agreement) entered into by the Department and Reliant Energy."  Def. Ex. 14.  The amendments did not affect any of the WQBELs in the 2001 Permit at issue in this case.  <u>Id.</u>; <u>see also</u> Amended 2001 Permit (Def. Ex. 3), cover page (list of permit amendments).

DEP provided no public notice of or opportunity to comment on the contents of the Consent Order and Agreement (the "COA").  <u>See</u> Kratka Dec. ¶ 3.  The COA itself did not amend any of the WQBELs at issue in this case.[10]  Nor does the COA *enforce* those limits.  As discussed below, DEP did not issue the COA under its statutory enforcement authority.  <u>See id.</u> ¶ 1, at 13.  Rather, the COA "resolv[es] the issues raised in Reliant Energy's appeal of its NPDES

---

the extent the Court accords any weight to Reliant's "net reduction" analysis, this document supplying a "missing piece" of that analysis should be weighed similarly.

[10] Nor could it have:  because notice and comment and other required permit modification procedures were not followed, the COA cannot alter permit terms.  <u>See</u> <u>Pennsylvania PIRG v.</u> <u>P.H. Glatfelter Co.,</u> 128 F. Supp. 2d 747, 759-60 (M.D. Pa. 2001).  Accordingly, DEP has made clear that, regardless of their characterization as "goals" in the COA, Reliant's WQBELs

> became final and effective three years after the NPDES Permit was issued, and did so as
> a matter of law.  It is the NPDES Permit itself which established the effluent limitations
> by which Reliant's compliance is to be measured.  The 2004 Consent Order was and is
> only a reflection of the Department's exercise of its enforcement discretion as to
> Reliant's violation of those WQBELs, for a period of time, until February 2011.

Letter from Sam Harper, DEP to Stephen Frank, Reliant (Feb. 27, 2009) (Def. Ex. 32) at 1.

Permit."  Id., cover letter.  Accordingly, the COA did not assess a penalty for any of the

violations alleged in this suit; indeed, since the WQBELs had not then taken effect, there had not

yet been any violations to enforce.

The COA is, in fact, the *opposite* of enforcement:  by characterizing all of the final water

quality-based effluent limits at outfalls 003 and 007 as "goals," DEP eliminated any possibility

that it *could* penalize Reliant under the COA for violating them.  DEP exercised its discretion *not*

to enforce these WQBELs prior to February 1, 2011 – unless the agency affords Reliant even

*more* time to comply in a subsequent compliance schedule.[11]  Id. ¶ U, at 7, ¶¶ 7-8, at 17-18.  Not

surprisingly, Reliant itself views the purpose of the COA as providing an opportunity for Reliant

to try to weaken its "final WQBELs" without having to worry in the meantime about

compliance.  Def. Mem. at 7.[12]

With respect to mercury monitoring, the COA required Reliant to use an analytical test

for mercury at outfall 007 with a method detection limit ("MDL") sufficiently sensitive to show

whether Reliant is complying with its mercury effluent limit (0.003 mg/l, or 3 parts per billion),

as required by the 2001 Permit, or to calculate, seek approval for, and use an alternative method

capable of achieving a less sensitive "site-specific" MDL for mercury.  Def. Ex. 12 ¶¶ AG-AH,

at 10-11, ¶ 9, at 18.  By September 2006, Reliant had determined internally that it would, in fact,

be able to reliably detect mercury in its wastewater at sufficiently low concentrations – the parts

per trillion level – using EPA test method 1631.  See Email from David A. Reed, Reliant Senior

---

[11] Although Reliant did not even appeal the WQBELs for iron, aluminum, or manganese at
outfall 003 or for iron or manganese at outfall 007, see COA (Def. Ex. 12), ¶ E, at 2-4, DEP
nonetheless agreed to refrain from enforcing these limits as well.

[12] The COA provides two avenues for Reliant to seek "alternative" effluent limits:  by
conducting studies of the toxicity of Reliant's wastewater as compared to the toxicity of
Conemaugh River water, Def. Ex. 12 ¶ 5, at 15-16, and by collecting and presenting "additional
site-specific data" relating to its WQBELs, id. ¶ 6, at 17.  As for "compliance," Reliant need only
"submit an annual report outlining its efforts to meet the WQBELs" until such time as DEP
actually "imposes" those limits (in 2011 or later), id. ¶ 7, at 17.

Chemical Specialist, to Richard Beer (Dec. 22, 2006) (Pl. Ex. 11).[13]  Yet Reliant admits that it did not begin using this method and complying with its permit until February 2008 – three years after the alleged monitoring violations began.  See Teitt Dec. (Def. Ex. 2) ¶ 52.

For its part, Reliant has certainly been diligent in one area:  its efforts to weaken or eliminate its water quality-based effluent limits.  See Def. Mem. at 6-7, 9-11.  Despite years of studies and the expenditure of millions of dollars in this enterprise, however, Reliant has failed "to supply [DEP] with a principled, science-based basis" for any meaningful alteration to the WQBELs.  Harper Letter (Def. Ex. 32), at 2.

Reliant claims it has also been diligent in "investigating" treatment technologies for outfalls 003 and 007.  While Plaintiffs vigorously dispute this characterization,[14] it is simply not relevant to the issue of whether the COA has any preclusive effect on the Court's jurisdiction to hear this lawsuit.[15]

DEP had another opportunity to enforce the 2001 Permit, but ultimately declined to do so.  On April 5, 2007, the Commonwealth of Pennsylvania, through DEP, commenced a civil

---

[13] Plaintiffs informed DEP of this development in comments submitted to the agency on July 13, 2007.  Pl. Ex. 12.

[14] For example, while DEP stated in 2004 that appropriate treatment technologies did not yet exist for selenium and boron removal (a point Plaintiffs are prepared to refute with expert testimony at trial), no such finding was made regarding aluminum, iron, or manganese.  Yet Reliant did not even begin to *study* treatment of its cooling tower discharges at outfall 003 until more than a year after the WQBELs went into effect, see Letter from Stephen Frank to Dana Krach (Jan. 26, 2009) (Def. Ex. 31), Att. 2, at 4 – a full 13 years after DEP told Reliant these limits were coming.  Reliant is even now still merely *proposing* a treatment system for outfall 003 to DEP, see Teitt Dec. (Def. Ex. 2) ¶ 43.  The company is even further behind with respect to metals removal at outfall 007.  See Def. Mem. at 10-11 (Reliant has proposed treatment insufficient to comply with permit limits – a proposal DEP has rejected).  Further, Reliant does not explain why it could not have used EPA Method 1631 to test for mercury beginning in 2005, rather than waiting until 2008.  See Teitt Dec. (Def. Ex. 2) ¶ 52.  Plaintiffs expect to argue, after discovery is completed on this issue, that avoidance of added costs was a significant factor.

[15] Avoided costs of compliance and any good faith efforts to comply are factors to be weighed in assessing a civil penalty, see 33 U.S.C. § 1319(d), and the technological feasibility of compliance may be a consideration in fashioning injunctive relief.  But even under Reliant's interpretation of CWA section 309(g)(6), it is the *agency's* diligence in mandating compliance that is relevant, not the company's good faith.

action against Reliant in the Court of Common Pleas for Indiana County to enforce the Clean Streams Law violations alleged in Plaintiffs' February 6, 2007 notice of intent to sue Reliant. Complaint, Civil Action No. 10727 CD 2007 (Pl. Ex. 13).  On May 3, 2007, this Court ordered a stay of all proceedings in the instant case to enable the parties and DEP to explore settlement. Proceedings in the state court lawsuit were concurrently stayed.  Joint Petition for Stay of All Proceedings (May 4, 2007) (Pl. Ex. 14).  Settlement discussions ultimately broke down, see Harper Letter (Def. Ex. 32), at 2, and DEP withdrew the state court action on October 1, 2008, having secured no relief.  Praecipe for Discontinuance (Pl. Ex. 15).  This Court's stay expired on December 5, 2008.  DEP has informed Reliant that, far from viewing this action as "collateral litigation" that could "whip-saw" Reliant with "inconsistent obligations," Def. Mem. at 1, 2, it is deferring to Plaintiffs' lawsuit for enforcement of Reliant's NPDES violations:

> In your [*i.e.*, Reliant's] letter of December 29, 2008, you acknowledged that there are still several outstanding violations at the Conemaugh facility. … I urge you, again, to negotiate an amicable resolution to Reliant's dispute with the citizens' group Plaintiffs. The Department continues to believe that that is the most reasonable way forward.

Harper Letter (Def. Ex. 32), at 2.

## **Plaintiffs Are Harmed by Reliant's Permit Violations.**

Plaintiffs PennEnvironment and Sierra Club are non-profit membership organizations whose corporate purposes include research, public education, litigation, and advocacy to protect the environment and people of Pennsylvania, including the quality of Pennsylvania's water.  See generally Plaintiffs' Answers to Defendants' First Set of Interrogatories ("Pl. Int. Resp.") (Def. Ex. 34), No. 16; Masur Dep. (Def. Ex. 8), at 12; Wolper Dep. (Def. Ex. 7), at 11. PennEnvironment has approximately 15,000 members in Pennsylvania and Sierra Club has approximately 27,000 members in Pennsylvania, including members who live or own homes near the Conemaugh Generating Station and who participate in recreational activities on or near the Conemaugh River.  See Pl. Int. Resp. (Def. Ex. 34), No. 16.

In 2007, PennEnvironment released a report entitled "Troubled Waters" (Def. Ex. 33), which detailed Clean Water Act compliance in Pennsylvania.  See Masur Dep. at 14.  Because of the "track record of violations at the Reliant Conemaugh Facility" revealed in the report, Def. Ex. 33 at 32, PennEnvironment Executive Director David Masur decided to initiate an enforcement action against Reliant, after first seeking legal advice as to the advisability of a suit.[16]  Masur Dep. at 14-15.

For the purposes of providing standing testimony in this case, PennEnvironment and Sierra Club have identified three individual members of the groups who have extensive contacts with the Conemaugh River downstream of the CGS.  Ample evidence of concrete, particularized actual injury is contained in Plaintiffs' answers to interrogatories and Rule 30(b)(6) depositions (Def. Exs. 7, 8, 34), and in the deposition testimony of PennEnvironment and Sierra Club members Kurt Limbach, Mike Burk, and David Neatrour (Def. Exs. 4-6).  As detailed in Part II.A below, each of these individuals has testified to his personal observations of the effects of excessive levels of metals in the river, and each has established how the impaired state of the river, and Reliant's illegal contributions to that impairment, have adversely affected him.

## ARGUMENT

I.  **SECTION 309(g)(6) OF THE CLEAN WATER ACT DOES NOT DEPRIVE THIS COURT OF JURISDICTION.**

The DEP Consent Order and Agreement ("COA") did not assess penalties, did not seek or secure compliance with any of the permit requirements Plaintiffs seek to enforce, and was negotiated without the procedural protections required to be provided in federal administrative

---

[16] Reliant's criticism of Plaintiffs for seeking the assistance of legal counsel in preparing this case, Def. Mem. at 2, 16-17, rings hollow.  See Student PIRG of N.J. v. AT&T Bell Labs., 842 F.2d 1436, 1449-50 (3d Cir.1988) (Congress authorized recovery of attorneys' fees by citizen plaintiffs to attract competent counsel, thereby encouraging vigorous enforcement of, and compliance with, the Act).  And Reliant's compliant that Plaintiffs did not initiate *more* litigation as a result of the "Troubled Waters" report, Def. Mem. at 17-18, is odd, given the company's position that this lawsuit is one too many.  Neither point is relevant to the standing analysis.

penalty actions.  Yet Reliant's view is that "this case presents a textbook case for application of Section 309(g)(6)'s bar on citizen suits"[17] simply because the COA is an administrative "action." Def. Mem. at 21-26 (citing 33 U.S.C. § 1319(g)(6)(A)(ii)).  Notably missing from Reliant's argument is most of the language of section 309(g)(6) itself.  A proper examination of that language, its legislative history, and an unbroken chain of EPA interpretive statements supporting a plain reading of section 309(g)(6), compel quite the opposite conclusion:  that Congress intended federal enforcement suits such as this one to go forward.[18]

### A. CITIZEN ENFORCEMENT SUITS ARE TO BE ENCOURAGED UNDER THE CLEAN WATER ACT.

According to Reliant, citizen suits are disruptive and meddlesome, and this Court should read section 309(g)(6)(A) expansively (*i.e.*, beyond its express terms) to bar citizen suits whenever state agencies "exercise their enforcement responsibility" in any manner whatsoever. Def. Mem. at 21.  What Reliant neglects to mention is that Congress also declared, as a fundamental goal of the Act, that "[p]ublic participation in the development, revision, and *enforcement* of any regulation, standard, effluent limitation, plan, or program" established under the Act "shall be provided for, encouraged, and assisted by [EPA] and the States."  33 U.S.C. § 1251(e) (emphasis added).  Citizens bringing suit under section 505 act as "private attorneys general," Natural Resources Defense Council ("NRDC") v. Texaco Ref. & Mktg., Inc., 2 F.3d 493, 503 (3d Cir. 1993); as such, they "effectively stand in the shoes of the EPA" in protecting federal enforcement interests.  Powell Duffryn, 913 F.2d at 74 (quoting Sierra Club v. Chevron

---

[17] As discussed below, section 309(g)(6)(A), even when applicable, does not wholly "bar" a federal court enforcement action by EPA or affected citizens.

[18] Reliant does not, and cannot, argue that DEP's withdrawn state court action precludes Plaintiffs' suit under 33 U.S.C. § 1365(b)(1)(B) simply because it was "commenced."  That suit is neither pending nor "diligently prosecuted."  See Student PIRG of N.J. v. Georgia-Pacific Corp., 615 F. Supp. 1419, 1427 (D.N.J. 1985); PIRG of N.J. v. Rice, 774 F. Supp. 317, 327 (D.N.J. 1991); cf. Proffitt v. Rohm & Haas, 850 F.2d 1007, 1013 (3d Cir. 1988) ("It would be unreasonable to construe the reference in the stay provision to 'commencement' of an action to apply even after Rohm & Haas withdrew that action.").

  
U.S.A., Inc., 834 F.2d 1517, 1522 (9th Cir. 1987)).  Where Congress chose to place restrictions on this private right of enforcement, it did so explicitly, and in ways designed to spur aggressive enforcement of, and compliance with, the Act.[19]  In all other situations, it was the intent of Congress "that enforcement of [the Act's] control provisions be immediate, that citizens should be unconstrained to bring these actions, and that the courts should not hesitate to consider them." S. Rep. No. 92-414, at 80 (1971) (Pl. Ex. 16); see also Chevron, 834 F.2d at 1225 ("[C]itizen suits should be handled liberally, because they perform an important public function.").

It is true, as Reliant notes, that citizen enforcement was intended to "supplement, rather than to supplant" government enforcement.  Def. Mem. at 21 (quoting Gwaltney, 484 U.S. at 60).  But Congress drew the line between "supplementing" and "supplanting" in the express terms of the statute itself, and was quite comfortable with the possibility that government and citizen enforcement roles might overlap.[20]  The "supplement … supplant" statement from Gwaltney cannot be read to override the words chosen by Congress.  In fact, the central holding

---

[19] See, e.g., 33 U.S.C. § 1365(b)(1)(A) (at least 60 days prior to filing suit, citizens must give notice of alleged violation to EPA, state, and violator, to allow those entities to bring violations to permanent halt); Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 64 (1987) (citizens may only bring suit where violation was ongoing at time suit was filed)).  See generally Rohm & Haas, 850 F.2d at 1011-12 ("[Section 505] reflect[s] a deliberate choice by Congress to widen citizen access to the courts, as a supplemental and effective assurance that the Act would be implemented and enforced.") (citation omitted).

[20] Congress ensured that citizen suits would not "supplant" agency enforcement by specifying that EPA or a state can always either:  (1) wholly preclude a citizen suit by filing and "diligently prosecuting" a *civil suit* for the same violations prior to the filing of the citizen suit, 33 U.S.C. § 1365(b)(1)(B); (2) preclude a citizen penalty claim by instituting an *administrative penalty action* for the same violations before the citizen's 60-day notice is served, see 33 U.S.C. § 1319(g)(6)(A); or (3) take enforcement action *after* a citizen suit is filed.  Further, EPA (but not the states) has an absolute right to *intervene* in any citizen suit once it is filed, and must be served with all citizen complaints and proposed consent judgments.  See 33 U.S.C. § 1365(c)(2) & (3). Conversely, citizens may "supplement" government enforcement by, *e.g.*, (1) bringing suit to enforce violations *different* from those addressed by an agency's civil enforcement suit, 33 U.S.C. § 1365(b)(1)(B); (2) intervening "as a matter of right" in federal civil enforcement suits, id.; or (3) seeking *injunctive relief* to halt ongoing violations related to those for which EPA or a state has already assessed administrative penalties, see 33 U.S.C. § 1319(g)(6)(A).

in Gwaltney is based on a *literal* reading of the Clean Water Act.  See 484 U.S. at 56 (interpreting section 505(a)(1)).

Reliant's focus on the allegedly intrusive nature of citizen enforcement ignores another important point:  any preclusive effect of state penalty assessments under section 309(g)(6)(A) applies equally to "civil penalty actions" by EPA.  33 U.S.C. § 1319(g)(6)(A) (referencing 33 U.S.C. §§ 1319(d), 1321(b)); see also United States v. BP Oil, Inc., 1989 WL 83623, at *3 (E.D. Pa. 1989).  To read 309(g)(6) as broadly as Reliant urges – *i.e.*, as allowing virtually any action by a state agency to bar federal enforcement – would be inconsistent with the fundamental congressional intent that implementation and enforcement of the Act be done according to *federal* standards.  See generally Cleveland Elec. Illuminating Co. v. EPA, 603 F.2d 1, 5 (6th Cir. 1979) (EPA remains the dominant agency for achieving purposes and goals of the Act "even after a state permit program has been approved.").[21]

Congress crafted section 309(g)(6) not as a means of reigning in citizen suits (as Reliant would have this Court believe), but as a way of striking a balance between administrative and judicial penalty assessment generally.  See S. Rep. No. 99-50 (Pl. Ex. 17), at 28 (1985) (stressing "[t]he need to avoid placing obstacles in the path of such citizen suits").  The provision was added to the Clean Water Act in 1987, at the same time Congress broadened EPA's enforcement powers by granting it the authority to impose penalties administratively.

**B.      BY ITS PLAIN TERMS, SECTION 309(g)(6) ONLY BARS FEDERAL COURT PENALTY ACTIONS WHEN AN AGENCY IMPOSES ADMINISTRATIVE PENALTIES FOR THE SAME VIOLATIONS OF THE ACT.**

As Gwaltney instructs, "the starting point for interpreting a statute is the language of the statute itself."  484 U.S. at 56 (citation omitted).  Section 309(g)(6)(A) says, in plain English,

---

[21] The role of state agencies is circumscribed by federal law, which EPA retains primary authority to implement.  See EPA v. California ex rel. State Water Resources Control Bd., 426 U.S. 200, 206-08 (1976).  Indeed, a chief reason for the passage of the 1972 Act was the failure of state agencies to adequately enforce water pollution laws.  See S. Rep. No. 92-414 (Pl. Ex. 16), at 2, 5.

that a state administrative order only affects a citizen (or EPA) enforcement suit when it *assesses monetary penalties* for the *same violations* addressed by the federal suit, and when those penalties are assessed pursuant to a state law "comparable" to the *federal administrative penalty provisions* in section 309(g).

Section 309 of the Act sets forth EPA's enforcement powers, which include the authority to bring civil actions for injunctive relief, 33 U.S.C. § 1319(b), to bring civil actions for penalties, 33 U.S.C. § 1319(d), and to issue administrative compliance orders (*i.e.*, orders to take corrective action) without bringing suit, 33 U.S.C. § 1319(a)(3). Subsection (g) of this section (entitled "Administrative penalties") gives EPA the further authority, without bringing suit, to order violators to pay monetary fines for past violations.[22] 33 U.S.C. § 1319(g)(1)(A) (authorizing administrative penalties when a discharger "has violated" the Act).

Section 309(g)(6)(A), which Reliant declines to quote in full, states:

Action taken by the Administrator or the Secretary, as the case may be, *under this subsection* shall not affect or limit the Administrator's or Secretary's authority to enforce any provision of this chapter; except that *any violation* –

    (i) with respect to which the Administrator or the Secretary has commenced and is diligently prosecuting *an action under this subsection*, (ii) *with respect to which* a State has commenced and is diligently prosecuting *an action under a State law comparable to this subsection*, or (iii) *for which* the Administrator, the Secretary, or the State has issued *a final order* not subject to further judicial review and *the violator has paid a penalty assessed under this subsection, or such comparable State law*, as the case may be,

shall not be the subject of *a civil penalty action* under subsection (d) of this section or section 1321(b) of this title or section 1365 of this title.

33 U.S.C. § 1319(g)(6)(A) (emphasis added). A straightforward reading of the entire provision reveals the following.

---

[22] Subsections (a), (b), and (d) have been part of the Act since 1972. Prior to the addition of subsection (g) in 1987, the only way EPA could assess monetary penalties was to bring a civil suit in federal court under subsection (d). See BP Oil, 1989 WL 83623, at *2 n.5.

First, the only type of "action" with preclusive effect under section 309(g)(6)(A) is an administrative *penalty* action – this provision is not triggered by administrative *compliance* orders, or by other agency orders that do not seek to impose penalties.[23]  The reference in subparagraph (i) to "an action under this subsection" means an administrative penalty action, since "this subsection" – subsection (g) of section 1319 – authorizes no other sort of agency action.[24]  Accordingly, the reference in subparagraph (ii) to "an action under a State law comparable to this subsection" means "an action 'comparable' to an EPA action for administrative penalties under section 1319(g)."  Washington PIRG v. Pendleton Woolen Mills, 11 F.3d 883, 886 (9th Cir. 1993); see also Tobyhanna Conservation Ass'n v. Country Place Waste Treatment Co., 734 F. Supp. 667, 669-70 (M.D. Pa. 1989) (no preclusion where "no order issued assessing a civil penalty"); BP Oil, 1989 WL 83623, at *3 (same); Old Timer, Inc. v. Blackhawk-Central City Sanitation Dist., 51 F. Supp. 2d 1109, 1114-15 (D. Colo. 1999) (same).[25]  Any other interpretation would be inconsistent with subparagraph (iii), which makes

---

[23] Reliant erroneously states that "courts have uniformly held" to the contrary.  Def. Mem. at 22.  This is demonstrably untrue, both generally and within this Circuit.  See cases cited in body text.  In fact, it is even untrue of the very case Reliant cites in support.  See Arkansas Wildlife Fed'n v. ICI Americas, Inc., 29 F.3d 376, 377-78 (8th Cir. 1994) (agency administrative orders assessed monetary penalties).

[24] In arguing to the contrary, Reliant badly misstates the scope of section 309(g).  Def. Mem. at 21 (claiming that "this subsection … generally permits … *the issuance of compliance orders*" in addition to administrative penalties, thus suggesting that *any* sort of administrative action has preclusive effect).  It is subsection (a), not subsection (g), that authorizes compliance orders.  Moreover, section 505 specifically grants citizens the right to sue to *enforce* the terms of compliance orders, whether issued by EPA or states.  See 33 U.S.C. § 1365(a)(1)(B).  This provision would be eviscerated if the issuance of a compliance order *precluded* citizen suits.

[25] The Third Circuit's ruling in Student PIRG of N.J. v. Fritzsche, Dodge & Olcott, Inc., 759 F.2d 1131, 1139 (3d Cir. 1985), is not to the contrary.  In that case, the Court analyzed whether an administrative order might have preclusive effect *under section 505(b)(1)(B)* as an "action in a court" (an argument Reliant does not make here).  Id. at 1135.  First, this case may no longer be good law.  See PIRG of N.J. v. Witco Chem. Corp., 1990 WL 66178, at *6 (D.N.J. 1990) (because of 1987 amendments, Third Circuit likely would reach different result today).  Second, the features that Fritzsche held might make an agency action the equivalent of an "action in a court" are not present here.  Compare 759 F.2d at 1138 (EPA "administrative enforcement orders are not self-executing"), with COA (Def. Ex. 12) ¶ 11(d), at 20 (DEP must "commence an

clear that the endpoint of the administrative actions referenced in subparagraphs (i) and (ii) is the assessment of "a penalty."  And, as the very next subparagraph of section 309(g)(6) indicates, "[t]he limitations contained in subparagraph (A)" pertain only to "civil *penalty* actions," not to "civil actions" generally.  33 U.S.C § 1319(g)(6)(B) (emphasis added).[26]

Second, the penalty action must be commenced or concluded "under" (*i.e.*, "pursuant to") section 309(g) or a comparable state law – it is not enough that the state has an administrative penalty law on the books.  See Citizens for a Better Env't-Cal. v. Union Oil Co. of Cal. ("Unocal"), 83 F.3d 1111, 1117-18 (9th Cir. 1996).  Reliant argues that preclusive effect should be given whenever a state has an administrative penalty law,  regardless of whether the state has actually *invoked* that law to seek penalties in the administrative action in question.  Def. Mem. at 25 (citing ICI Americas, 29 F.3d at 381).  There is no logic to this reasoning.  To bring an action "under" a particular law means to utilize the powers and authorities of that law; it does not mean simply to have that law at one's disposal.  See Ardestani v. INS, 502 U.S. 129, 135 (1991).[27]

Third, subparagraphs (i) and (ii) of section 309(g)(6)(A), regarding the "diligent prosecution" of a federal or state administrative penalty order, apply only to penalty actions that

---

action" to obtain injunctive relief); see also 759 F.2d at 1139 ("private negotiations" leading to "consent order" do not trigger section 505(b)(1)(B)).

[26] That Congress chose its words carefully here is evidenced by the fact that Congress used the broader term "a civil action" and "an action" elsewhere in subparagraph (B).  33 U.S.C § 1319(g)(6)(B)(i) & (ii).  If Congress had wanted administrative compliance orders to preclude citizen suits, it would have said so (as it did in other environmental statutes).  See Pendleton, 11 F.3d at 886.

[27] This requirement does not cause the application of section 309(g)(6)(A) to "turn[] on the logistical happenstance of [state] statutory drafting."  North & South Rivers Watershed Ass'n, Inc. v. Town of Scituate, 949 F.2d 552, 556 (1st Cir. 1991).  The controlling factor is the drafting of section 309(g)(6)(A), which clearly requires that the "comparable" state statute *actually be applied*.  This furthers the congressional purpose that administrative penalties – which are to be "no less stringent than those which would be assessed in court for the same violations" – be "both promptly assessed and promptly paid."  S. Rep. No. 99-50 (Pl. Ex. 17), at 26.  And, as Unocal notes, "the holding of Scituate leads to the anomalous conclusion that state administrative enforcement actions would more broadly preclude citizen suits than the administrative enforcement actions of the EPA," a result unsupported by the language, structure, or legislative history of the Act.  83 F.3d at 1118.

are *still in the process of being finalized*, and not to actions that have already resulted in a final order.  See PIRG of N.J. v. GAF Corp., 770 F. Supp. 943, 949 (D.N.J. 1991) (finalized, negotiated consent order predating citizen suit does not trigger section 309(g)(6)(A)(ii)).  This is clear from subparagraph (iii), which applies to "final order[s] not subject to further judicial review."  Significantly, subparagraph (iii) gives preclusive effect to such orders only if they assess, and the violator has paid, a penalty (neither of which is the case here).  Thus, the primary focus of Reliant's motion – the contention that DEP is "diligently prosecuting" the COA, Def. Mem. at 7-16, 22-24 – is a red herring.

Fourth, the administrative penalty action must have been undertaken "with respect to" the same set of "violations" of the Act sought to be resolved by the EPA or citizen enforcement suit. See Coalition for a Liveable West Side, Inc. v. New York City DEP, 830 F. Supp. 194, 197 (S.D.N.Y. 1993); Save Our Bays & Beaches v. City & County of Honolulu, 904 F. Supp. 1098, 1126 (D. Hawai'i 1994).  An administrative penalty action addressing a different set of violations does not call section 309(g)(6) into play.

The legislative history of the 1987 CWA Amendments wholly supports this straightforward reading of the statute.  The administrative penalty authority was intended to resolve only "less complex cases" involving "past, rather than continuing, violations of the Act," where such infractions would be "likely uncontested by the violator" and "easily corrected."  S. Rep. No. 99-50 (Pl. Ex. 17), at 26-27.  Congress emphasized that administrative penalties should "not become a substitute for judicial action"  Id. at 26.[28]

> [Section 309(g)(6)] applies only to an action *for civil penalties* for the *same violations* which are the subject of the *administrative penalties* proceeding.  It would not apply to an action for civil penalties for a violation of the same requirement of the Act that is not being addressed administratively or for a past violation of another pollutant parameter … [or to] an action under section

---

[28]  "Continuing violations are more appropriately addressed by abatement orders or injunctive relief actions," and "if EPA seeks both civil penalties and injunctive relief, one judicial action should be filed."  Id.

> 505(a)(1) of this Act filed prior to commencement of an administrative *civil penalty* proceeding for the *same violation* …

Id. at 28 (emphasis added); see also id. (bar applies only where agency "has commenced and is prosecuting an *administrative penalty action*, or … for which the violator has *paid the penalty*"); H.R. Conf. Rep. No. 99-1004 (Pl. Ex. 18), at 133 (1986) (same); H.R. Rep. No. 99-189 (Pl. Ex. 19), at 32 (1985) (preclusion extends only "if the Administrator or state has commenced and is diligently pursuing *the assessment of a civil penalty*") (emphasis added).

In arguing to the contrary, Reliant falls back on sweeping *dicta* from the First Circuit's Scituate opinion to the effect that "citizen suits are proper only if … agencies fail to exercise their enforcement responsibility"[29] or "appear unwilling to act."  Def. Mem. at 21 (quoting 949 F.2d at 555, 557).  But Scituate disregards the language of the statute and the pertinent legislative history, and instead bases its holding on a judicial policy judgment that failure to bar citizen suits would "chang[e] the nature of the citizen's role from interstitial to potentially intrusive."  949 F.2d at 555-56 & n.6.  Clearly, it is the role of Congress, not the courts, to make such policy judgments, and the words of Scituate cannot override those of Congress.  See, e.g., Pendleton, 11 F.3d at 886 (rejecting Scituate analysis).

EPA – the federal agency with primary responsibility for interpreting the Act, see 33 U.S.C. §§ 1251(d), 1361(a) – has long recognized Scituate's error as well.  Across the span of at least three separate Administrations, EPA has taken the position that section 309(g)(6) means what it says, and that Scituate and subsequent cases relying on it are wrongly decided.  In August 1987, shortly after section 309(g) was added to the Act, EPA issued a guidance document concluding that "in order to preempt [a] federal judicial penalty action, the NPDES State must have collected, or at least commenced and be diligently prosecuting, *an appropriate and*

---

[29] This statement from Scituate is, in turn, a quotation of a passage from the 1971 legislative history of the Act (*i.e.*, long before the addition of section 309(g) was contemplated).  See 949 F.2d at 557 (citing S. Rep. No. 92-414 (Pl. Ex. 16), at 64).  The reference in the Senate Report to an agency's "exercise of enforcement responsibility" meant diligently prosecuting "a civil or criminal action *in a court* … to require compliance," 33 U.S.C. § 1365(b)(1)(B) (emphasis added), or taking action sufficient to permanently end the violations before the citizen suit was filed.

*adequate administrative penalty* under a statute comparable to Section 309(g)."[30]  EPA,

Guidance on State Action Preempting Civil Penalty Actions Under the Federal Clean Water Act

(Aug. 28, 1987) ("EPA 1987 Guidance") (Pl. Ex. 20), at 6.  Four years later, in <u>Scituate</u> itself,

EPA filed an amicus brief arguing squarely against the position the court ultimately adopted;

shortly thereafter, EPA filed an amicus brief in the Ninth Circuit <u>Pendleton</u> case successfully

urging that court not to follow <u>Scituate</u>.  <u>See</u> EPA, Supplemental Guidance on Section

309(g)(6)(A) of the Clean Water Act (Mar. 5, 1993) ("EPA 1993 Guidance") (Pl. Ex. 21), at 2 &

n.2.  And, in March 1993, EPA issued a supplement to the 1987 guidance document, reiterating

the conclusion that section 309(g)(6)(A) applies only when there is "an administrative penalty

action," and expressly repudiating <u>Scituate</u>.[31]  <u>Id.</u> at 1-5.

### C.    THE COA DID NOT SEEK OR IMPOSE AN ADMINISTRATIVE PENALTY.

Reliant argues that subparagraph (ii) of section 309(g)(6)(A) applies here. Def. Mem. at

22.  Plainly, it does not.  The COA is a final order not subject to further judicial review (indeed,

it was *never* judicially reviewable) and, as discussed above, must be evaluated under

subparagraph (iii) of section 309(g)(6)(A).  The COA neither sought nor imposed administrative

penalties, and Reliant has paid no penalties under the COA.  Moreover, DEP did not bring the

COA "under" (*i.e.*, pursuant to) 35 PA. CONS. STAT. § 691.605, Pennsylvania's administrative

penalty law, but rather under "Section 5 of the Clean Streams Law" and "Section 1917-A of the

---

[30] Informal agency pronouncements such as this are "entitled to respect" based on their "power to persuade."  <u>Madison v. Resources for Human Dev., Inc.</u>, 233 F.3d 175, 186 (3d Cir. 2000).  The persuasiveness of an agency interpretation is heightened by "its consistency with earlier and later pronouncements," and "agency interpretations issued contemporaneous with a statute are entitled to greater deference."  <u>Id.</u> at 187 (citation omitted).  Although the 1987 document only addressed enforcement by EPA, the agency made clear in its subsequent <u>Scituate</u> and <u>Pendleton</u> amicus briefs its view that the same principles apply to citizen suits.

[31] EPA also noted, consistent with <u>Unocal</u> and contrary to <u>Scituate</u>, that the "comparable" administrative penalty law requirement "is not satisfied simply because the entire statutory scheme of the state law contains similar enforcement mechanisms."  <u>Id.</u> at 4.  Further, EPA agreed with <u>GAF Corp.</u> that section 309(g)(6)(A)(ii) only applies to ongoing, not completed, administrative penalty actions.  <u>Id.</u> at 3.

Administrative Code," COA (Def. Ex. 12) ¶ 1, at 13 (pertaining, respectively, to DEP's *general authority* to implement the Clean Streams Law, 35 PA. CONS. STAT. § 691.5, and its power to issue *abatement orders* for nuisances, 71 PA. CONS. STAT. § 510-17).[32]

In fact, "[w]ith respect to" the violations for which Plaintiffs are suing, 33 U.S.C. § 1319(g)(6)(A), the COA is not even a compliance order.  Rather, its chief purpose was to settle Reliant's administrative appeal of certain terms in the 2001 Permit.  See Def. Ex. 12, cover letter; see also id. ¶ D, at 2; ¶ 15, at 21.  The agreement reflects a promise *not* to enforce the WQBELs for metals, with no possibility of DEP imposing penalties for violations of those WQBELs during the life of the COA.  See id. ¶¶ 3-8, at 14-18.  Reliant itself acknowledges that the purpose of the various studies required or allowed under the COA is to allow for the development of "appropriate" – *i.e.*, weaker – permit limits.  Def. Mem. at 7.  Where an agency sets forth a delayed compliance schedule and does not impose penalties,[33] section 309(g)(6)(A) does not apply.  See PIRG of N.J. v. New Jersey Expressway Auth., 822 F. Supp. 174, 184 (D.N.J. 1992).

---

[32] The only mention of 35 PA. CONS. STAT. § 691.605 in the COA is in reference to Reliant's failure to meet MDLs in reporting levels of certain organic pollutants and failure to comply with certain internal monitoring limits for selenium, Def. Ex. 12, ¶ AQ, at 13 (referencing ¶ Y, at 8; ¶ AD, at 10), but those violations are not at issue in this citizen suit, and DEP did not invoke its administrative penalty authority to actually assess penalties for them.

[33] The COA does provide for stipulated penalties for violations of the COA itself, Def. Ex. 12, ¶ 11(a), at 19, but stipulated penalties for future violations of a negotiated order are conceptually distinct from the administrative penalties for past violations contemplated by 309(g).  Cf. Gwaltney, 484 U.S. at 63 n.4 ("The fact that Congress consciously chose the past tense [in section 309(g)] to describe the Administrator's new authority to assess civil penalties suggests that Congress knows how to target past violations when it wants to do so.").  Nor are stipulated penalties assessed under procedural protections "comparable" to section 309(g).  See Knee Deep Cattle Co. v. Bindana Inv. Co., 94 F.3d 514, 516-17 (9th Cir. 1996) (stipulated penalties for violations of negotiated consent order do not trigger section 309(g)(6)).

### D.   EVEN IF THE COA HAD BEEN ISSUED UNDER PENNSYLVANIA'S ADMINISTRATIVE PENALTY LAW, THAT LAW IS NOT "COMPARABLE" TO SECTION 309(g)(6).

Even if the COA had been issued under the Pennsylvania administrative penalty law, Reliant's argument would fail for the additional reason that the Pennsylvania law is not "comparable" to section 309(g).  The "comparability" requirement exists to ensure that any penalties assessed for past violations are sufficiently stringent to discourage future violations.  See S. Rep. No. 99-50 (Pl. Ex. 17), at 27-28.  Accordingly, the state scheme *must* contain provisions regarding public participation and penalty assessment factors that are analogous to the requirements of federal law.  See EPA 1987 Guidance (Pl. Ex. 20), at 4-6 (citing legislative history); EPA 1993 Guidance (Pl. Ex. 21), at 4 (state law "must essentially mimic the substance" of 309(g)).[34]  See generally 33 U.S.C. §§ 1319(g)(4) & (8) (requiring public notice prior to setting penalty, allowing for evidentiary hearings to allow concerned citizens to press for higher penalties, and permitting judicial review); 1319(g)(2) & (3) (authorizing penalties of up to $10,000 per day to be determined by reference to, *inter alia*, discharger's economic benefit of noncompliance).

Pennsylvania's administrative penalty statute does not meet these criteria, and has already been held not to be "comparable" to section 309(g).  See L.E.A.D. v. Exide Corp., 1999 WL 124473, at *31 (E.D. Pa. 1999) (35 PA. CONS. STAT. § 691.605 does not give citizens "any meaningful opportunity to participate in the assessment of civil penalties").  The statute and its accompanying regulations do not provide for adequate public notice of proposed penalties or the

---

[34] See also Save Our Bays, 904 F. Supp. at 1133; NRDC v. Vygen Corp., 803 F. Supp. 97, 101 (N.D. Ohio 1992); Atlantic States Legal Found., Inc. v. Universal Tool & Stamping Co., 735 F. Supp. 1404, 1415 (N.D. Ind. 1990).  Reliant's argument to the contrary relies on the flawed ICI Americas and Scituate cases, see Def. Mem at 25-27, and would allow preclusion so long as the state law makes enforcement documents publicly available (requiring citizens to make sweeping, formal document requests on almost a continuous basis, so as not to waive comment/appeal rights) and allows citizens to *ask* to participate (but does not require that the request be granted).  See McAbee v. City of Fort Payne, 318 F.3d 1248, 1256-57 (11th Cir. 2003) (rejecting ICI Americas and Scituate as to what constitutes "meaningful opportunity" for public participation, and noting importance of substantive input before agency position has "hardened").

opportunity to participate in penalty hearings.  Compare 35 PA. CONS. STAT. § 691.605(a); 25

PA. CODE §§ 92.92 & 92.93,[35] with Jones v. City of Lakeland, 224 F.3d 518, 523-24 (6th Cir.

2000) (en banc) (state law not "comparable" where no prior public notice, or where agency had

discretion regarding citizen participation); GAF Corp., 770 F. Supp. at 951 (lack of prior public

notice makes state administrative consent order not "comparable").  Nor does the statute require

the penalty assessment to consider the violator's economic benefit from noncompliance, history

of violations, or ability to pay.  Compare 35 PA. CONS. STAT. § 691.605(a), with Unocal, 83 F.3d

at 1116 (settlement penalty not preclusive under 309(g)(6)(A) where no consideration of

economic benefit).

Moreover, the procedures followed in the issuance of the COA here were not comparable

to those in section 309(g).  DEP issued the COA without providing any prior notice to the public,

without providing any opportunity to review the settlement or to comment on it,[36] and without

holding any hearings.[37]  DEP's notice in the Pennsylvania Bulletin stated that the COA had

already been "entered into," and did not reference either Reliant's noncompliance or

---

[35] Added in 2000, sections 92.92 and 92.93 allow DEP to issue administrative penalties using an informal hearing process, rather than submitting the matter to the Environmental Hearing Board ("EHB").  Although the L.E.A.D. case was issued prior to this, neither provision provides any further "meaningful opportunity" for citizen participation.  See 25 PA. CODE § 92.93(b)-(c) (only violator or DEP may compel hearing; only violator has right to participate; public notice posted only at regional DEP office 5 days before hearing).

[36] The only comments sought by the notice were regarding a potential modification of Reliant's NPDES permit, which is unrelated to the violations Plaintiffs seek to enforce in this suit

[37] Thus, no administrative action was ever formally "commenced" with respect to the violations Plaintiffs seek to redress.  See New Jersey Expressway Auth., 822 F. Supp. at 184 (no "commencement" under section 309(g)(6)(A)(ii) where agency "began its 'proceeding' against defendant by sending the proposed MOU along with a cover letter, which neither specified the amount of penalty to be imposed nor advised of the right to a hearing"); cf. Student PIRG of N.J. v. Hercules, Inc., 1986 WL 6380, at *7 (D.N.J. 1986) (under section 505(B)(1)(B), no civil action "initiated" by agency where proceedings "consisted of negotiations leading to the filing of an Administrative Consent Order").  The case cited by Reliant found "commencement" because – unlike here – the filing of an administrative consent order triggered public notice, hearing, and intervention rights.  Def. Mem. at 22 (citing ICI Americas, 29 F.3d at 380).

administrative penalties.[38]  Def. Ex. 14; cf. PIRG of N.J. v. Elf Atochem N. America, Inc., 817 F.

Supp. 1164, 1173 (D.N.J. 1993) (no preclusion where published agency documents "make no

mention of formal charges, penalties, or a hearing").

      E.    **EVEN IF THE COA WERE A COMPLIANCE ORDER, AND EVEN IF COMPLIANCE ORDERS HAD PRECLUSIVE EFFECT, SECTION 309(g)(6)(A) WOULD BE INAPPLICABLE BECAUSE DEP HAS NOT "DILIGENTLY PROSECUTED" THE VIOLATIONS AT ISSUE IN THIS SUIT.**

Although, for all the reasons set forth above, this Court need not engage in a "diligent

prosecution" analysis to resolve the motion to dismiss, it is nonetheless true that DEP has not

"diligently prosecuted" compliance with the permit provisions Plaintiffs seek to enforce.  Reliant

makes much ado about protecting agency autonomy to make "compromises" and "reach

voluntary settlements," Def. Mem. at 23, but it is clear that, whatever discretion state or federal

agencies may have in securing compliance with the law, an agency does not "diligently

prosecute" violations by allowing them to continue.[39]  See EPA 1987 Guidance (Pl. Ex. 20), at 3-

---

[38] The other provisions of Pennsylvania law cited by Reliant, Def. Mem. at 26-27, did not give the public any rights to participate in or appeal the COA.   25 PA. CODE § 91.16 indicates that DEP "may" (not "must") publish notice of its actions in the Pennsylvania Bulletin.  There are citizen intervention rights under Pennsylvania law, but they do not pertain to a negotiated order such as the COA.  Rather, they pertain to civil abatement actions *in a court*, 35 PA. CONS. STAT. § 691.601(e), and adjudicative proceedings *before the EHB*, 35 PA. CONS. STAT. § 7514(e). Finally, while 25 PA. CODE § 1021.52 does allow aggrieved persons to appeal certain DEP actions to the EHB, see Def. Mem. at 27, this did not apply to the COA because, as Reliant notes elsewhere, its issuance was a legally-permissible exercise of DEP's "discretion" not to enforce the Clean Water Act, id. at 24; see DEP v. Schneiderwind, 867 A.2d 724, 727 (Pa. Commw. Ct. 2005) (EHB has no jurisdiction to hear challenges to DEP's "discretionary refusal to prosecute" state statute allowing citizen suits).  Plaintiffs' redress here is, as section 505 of the Act provides, against the *violator*, not the agency that allowed the violations to continue.  See Sierra Club v. Train, 557 F.2d 485, 491 (5th Cir 1977); Proffitt v. Davis, 707 F. Supp. 182, 187 (E.D. Pa. 1989).  Reliant's related observation that citizen groups may "challenge the issuance or formulation of a NPDES permit before the EHB," Def. Mem. at 27, is obviously irrelevant to whether those groups may challenge an *administrative penalty action*, see L.E.A.D., 1999 WL 124473, at *31 (noting that, under Pennsylvania law, they may not).

[39] Reliant quotes Gwaltney for the proposition that "[i]f citizens could file suit … in order to seek civil penalties that the [agency] sought to forego," then "the [agency's] discretion to enforce the Act in the public interest would be curtailed considerably."  Def. Mem. at 24 (citing 484 U.S. at 61).  This is disingenuous.  First, the Supreme Court was not there discussing, much less

4 ("Congress did not intend partial or inadequate state action to be a shield for violators of the Act"); City of Lakeland, 224 F.3d at 522-23 (no diligent prosecution where state agency agreed to allow violations to continue); Witco, 1990 WL 66178, at *5 (no diligent prosecution where state reached stipulated settlement but did not assess penalties for ongoing violations); cf. Georgia-Pacific Corp., 615 F. Supp. at 1427 (no diligent prosecution under section 505(b)(1)(B) where agency acquiesced in face of violations); Student PIRG of N.J. v. Fritzsche, Dodge & Olcott, Inc., 579 F. Supp. 1528, 1536-37 (D.N.J. 1984) (no diligent prosecution under section 505(b)(1)(B) where agency extended compliance deadlines), aff'd, 759 F.2d 1131 (3d Cir. 1985).

Here, any claim of "diligence" is farfetched at best.  DEP told Reliant in 1993 it would soon be subject to more stringent WQBELs.  Eight years later, DEP delayed the effective date of the WQBELs in the 2001 Permit for the maximum three years allowed under Pennsylvania law.  See 25 PA. CODE § 92.55(a) (three years is generally longest time deemed "as soon as practicable" for discharger to comply).  DEP then agreed in the COA not to enforce the WQBELs for an additional six years – a deadline it left open to still further negotiation.  Def. Ex.

---

analyzing, section 309(g)(6).  Second, the specific situation the Supreme Court was addressing, albeit in dictum, was one where an agency agrees not to press for penalties "on the condition that the violator take some extreme corrective action … that it otherwise would not be obliged to take," *i.e.*, an action going *above and beyond* what the law requires, 484 U.S. at 61, and not one where the agency asks for *less* than full compliance, as DEP has done here.  See Rice, 774 F. Supp. at 327 (no preclusion where permit terms relaxed through administrative consent order).  Moreover, the congressional goal in crafting the Act's enforcement provisions clearly was compliance and deterrence, and not settlement *per se*.  See, e.g., PIRG of N.J. v. Struthers-Dunn, Inc., 1988 WL 147639, at *3, *5 (D.N.J. 1988) (although designed to "encourage settlement," Fed. R. Civ. P. 68 held inapplicable to section 505 citizen suits because its application would "dilute" Congressional plan for Act's enforcement).  So long as agencies and violators enter into enforcement agreements that meet these goals, they will be free of subsequent citizen enforcement for the same violations.  See Oregon State PIRG v. Pacific Coast Seafoods Co., 341 F. Supp. 2d 1170, 1176 (D. Or. 2004) ("This court construes the 'diligent prosecution' bar narrowly in accordance with the intent of the CWA to prevent recalcitrant violators from escaping liability.").

12, ¶ 8(b), at 18.  As a result, the violations alleged in Plaintiffs' complaint have continued to occur on a consistent basis.[40]  See Def. RFA Resp. (Pl. Ex. 7), No. 1.

**F.      EVEN IF SECTION 309(g)(6) WERE APPLICABLE, IT WOULD ONLY PRECLUDE PLAINTIFFS' PENALTY CLAIMS.**

Even when section 309(g)(6)(A) is triggered, it only bars claims for civil penalties – and not for other relief – for the same violations that are the subject of the administrative penalty action.  33 U.S.C. § 1319(g)(6)(A) ("any *violation*" already subject to penalization "shall not be the subject of a *civil penalty action* under … section 1365 of this title") (emphasis added); Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Continental Carbon Co., 428 F.3d 1285, 1299-1300 (10th Cir. 2005) (explicitly rejecting reasoning of Scituate and ICI Americas); Witco, 1990 WL 66178, at *6; Coalition for a Liveable West Side, 830 F. Supp. at 196.  This straightforward reading is supported by other provisions of the Act,[41] the legislative history,[42]

---

[40] As Reliant concedes, the only COA requirement relating to the achievement (as opposed to the weakening) of WQBELs is the submission of annual "outlines" describing whatever research into treatment technologies or management practices Reliant chooses to do.  Def. Mem. at 8 (citing Def. Ex. 12, ¶ 7, at 17-18).  This comes nowhere close to the level of "diligent prosecution" found in the cases on which Reliant itself relies.  Def. Mem. at 22-24.  In Scituate, for example, the agency prosecuted the same violations alleged in the later citizen suit by ordering (1) the immediate prohibition of any new sewer connections; (2) groundwater and effluent testing to ensure no environmental insult would continue; and (3) a study plan for treatment technology upgrades, with a one-year deadline for choosing a solution, leading to an upgrade plan largely finalized by the time Plaintiffs filed suit.  See 949 F.2d at 553-54, 557.  Most of Reliant's cases (except Scituate and ICI Americas) involved *judicial actions* filed by agencies, which is unsurprising given Congress's intent that ongoing violations necessitating more complex relief (such as this one) not be addressed by administrative penalty actions.

[41] See 33 U.S.C. § 1319(g)(7) ("No action by the [EPA] Administrator … under [section 309(g)] shall affect any person's obligation to comply with any section of [the Act] or with the terms and conditions of any [NPDES] permit …").  If it had wanted to, Congress could have precluded other types of federal actions simply by extending the language to any "action," as it did in section 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

[42] Congress was concerned that administrative enforcement "not become a substitute for judicial action."  S. Rep. No. 99-50 (Pl. Ex. 17), at 26.  The Senate Report states:  "This authority to issue administrative penalty orders is intended to complement and not to replace a vigorous civil judicial enforcement program.  Civil judicial enforcement is a keystone of successful enforcement of the Act and necessary for [*inter alia*] *cases requiring injunctive relief*."  Id.

and EPA interpretations.[43]  Thus, even if this Court were to find section 309(g) applicable, the case would go forward and this Court would be free to craft appropriate injunctive relief to address Relaint's continuing noncompliance.  As noted by the Supreme Court in Gwaltney, 484 U.S. at 59, the role of the citizen suit is "primarily forward-looking."[44]

## II.    PLAINTIFFS HAVE STANDING TO BRING THIS ACTION.

Private parties have standing under Article III of the Constitution to sue in federal court when they possess "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends."  Baker v. Carr, 369 U.S. 186, 204 (1962).  A plaintiff has a "sufficient stake" in a controversy where (1) that plaintiff "personally suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," (2) the injury "fairly can be traced to the challenged action," and (3) the injury "is likely to be redressed by a favorable decision." Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472 (1982) (citations omitted).  Plaintiffs satisfy these requirements.[45]

(emphasis added); see also id. at 28 ("[T]his limitation would not apply to … an action seeking relief *other than civil penalties* (*e.g.*, *an injunction* … The agency can prevent duplicate *proceedings* [*i.e.*, can prevent a citizen suit altogether] by … bringing its own *judicial action* before a citizen suit is filed.") (emphasis added); H.R. Conf. Rep. No. 99-1004 (Pl. Ex. 18), at 133 (same).

[43] See EPA 1987 Guidance (Pl. Ex. 20) ("[T]he federal enforcement actions affected by the new preemption language of Section 309(g)(6)(A) are limited to … [j]udicial civil penalties for the same violations" and "[t]he preemption does not affect [*inter alia*] [j]udicial [i]njunction [a]ctions.").

[44] Scituate invoked section 309(g)(6)(A) to dismiss a citizen claim for injunctive relief, 949 F.2d at 557, and ICI Americas followed suit, although noting that this result is contrary to the language of the statute, 29 F.3d at 382-83.  The injustice to the language and history of the statute done by this approach can perhaps be seen most clearly in situations in which the federal plaintiff seeks only injunctive relief.  See, e.g., PIRG of N.J. v. Windall, 51 F.3d 1179, 1183 (3d Cir. 1995) (citizens may seek injunctive and declaratory relief under section 505 even where penalties are not available).  To accept the First and Eighth Circuits' tortured interpretation of the statute, one must accept that Congress intended to transform such a lawsuit into a "civil penalty action" for the purposes of section 309(g)(6) *even though no penalties are being sought*.

[45] Moreover, once a court finds that one plaintiff has standing, it need not determine the standing of the other plaintiffs.  See Bowsher v. Synar, 478 U.S. 714, 721 (1986).

A.      **PLAINTIFFS HAVE SUFFERED INJURY IN FACT.**

To confer standing, an injury must be (a) concrete and particularized, and (b) actual or imminent.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  Injury to aesthetic or recreational interests of those who aver they use the affected area is sufficient to confer standing. See Sierra Club v. Morton, 405 U.S. 727, 735 (1972).  Aesthetic injury can include impairment of one's desire to view wildlife.  See Lujan, 504 U.S. at 562-63.  The relevant inquiry is not whether there has been harm to the environment, but whether there has been harm to the plaintiff.  See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181 (2000).  A plaintiff's reasonable perception of the threat of such harm is enough to confer standing.  See id. at 184-85.  Plaintiffs who cease or curtail activities near a polluted waterway, or who never begin such activities because of the pollution, have standing.  See id. at 181-85.

First, Plaintiffs have established that they have a personal stake in the Conemaugh River downstream of the Conemaugh Generating Station.  David Neatrour (Sierra Club member since 1998, PennEnvironment member since January 2009) has lived in New Florence, PA, on eight acres of land he owns along Tubmill Creek, a major tributary of the Conemaugh River, since 1972.  Pl. Int. Resp. (Def. Ex. 34), No. 8; Masur Dep. (Def. Ex. 8), at 16; Neatrour Dep. (Def. Ex. 5), at 4, 15; Wolper Dep. (Def. Ex. 7), at 18.  He and his dog hike down to the south bank of the Conemaugh River, downstream from CGS, on a regular basis.  Pl. Int. Resp. No. 8; Neatrour Dep. at 31-33.  There he enjoys observing wildlife, including songbirds, raptors, and water birds, and collecting culinary and medicinal herbs, and sometimes wades in the river.  Pl. Int. Resp. No. 8; Neatrour Dep. at 14, 40-41, 50-51, 53-55.  On occasion, Mr. Neatrour has canoed on the Conemaugh River downstream of the Facility.  Pl. Int. Resp. No. 8; Neatrour Dep. at 22.

Kurt Limbach (PennEnvironment member since 2000, lifetime Sierra Club member since 1986) owns a home and approximately 229 acres of land overlooking the Conemaugh River downstream of CGS in Bolivar, PA.  Pl. Int. Resp. No. 8; Limbach Dep. (Def. Ex. 6), at 4, 26; Masur Dep. at 18, 30.  Mr. Limbach and his family kayak on the Conemaugh River six or seven times per year, and frequently launch in New Florence just downstream of the Conemaugh

Generating Station.  Pl. Int. Resp. No. 8; Limbach Dep. at 28-29.  He enjoys the Class 1, 2, and 3 rapids between New Florence and Bolivar and the scenic gorge called Packsaddle Gap, below Bolivar, which is accessible only via the river.  Pl. Int. Resp. No. 8; Limbach Dep. at 28. Mr. Limbach enjoys watching the water birds that live in the Conemaugh River Valley, and has fished with family and friends on tributaries of the Conemaugh River.  Pl. Int. Resp. No. 8; Limbach Dep. at 30, 50-52.

Michael Burk (PennEnvironment member since November 2006, Sierra Club member since January 2009) lives in Ebensburgh, PA.  Burk Dep. (Def. Ex. 4), at 4; Masur Dep. at 17, 40.  Mr. Burk has canoed countless times on the Conemaugh River, and often launches his canoe from New Florence, just below the Conemaugh Station.  Pl. Int. Resp. No. 8; Burk Dep. at 21. He particularly enjoys canoeing through the Packsaddle Gap, where he has uncovered Pennsylvania canal locks from the 1840s.  Pl. Int. Resp. No. 8; Burk Dep. at 22, 35-36.  Mr. Burk likes to view the fish and wildlife that populate the river.  Pl. Int. Resp. No. 8; Burk Dep. at 28.

This testimony clearly distinguishes the individuals' allegations of injury from "mere knowledge or concern" (Def. Mem. at 31-32) shared by the public at large.  See, e.g., GAF Corp., 770 F. Supp. at 952-53 ("walking, jogging, boating, swimming, and fishing in specific portions of the Passaic River downstream from defendant's facility and in nearby lands" sufficient to show injury-in-fact).

Second, Plaintiffs' concerns about the impacts of Reliant's discharges of metals are neither unfounded nor purely subjective, see Def. Mem. at 32.  Mr. Neatrour, Mr. Limbach, and Mr. Burk all know that the Conemaugh River suffers from the effects of acid mine drainage and other industrial pollution.  Pl. Int. Resp. No. 9; Burk Dep. at 23-24; Limbach Dep. at 37; Neatrour Dep. at 23-24, 46.  They know that excessive levels of metals in the river not only can, but *have* caused harm to fish and aquatic birds.  Pl. Int. Resp. No. 9; Burk Dep. at 29-30; Neatrour Dep. at 64-65.  And they know that Reliant is persistently discharging metals at levels that exceed permit limits designed to protect the river.  Burk Dep. at 14, 30, 33; Limbach Dep. at 19, 41, 47; Neatrour Dep. at 16, 43-44.

Moreover, their concerns are not merely academic.  Each man has personally observed the effects of excessive levels of metals downstream of CGS:  discoloration and staining of rocks, of sediments, and even of clothes splashed with river water; the river's metallic smell and taste; and reduced aquatic life.  Pl. Int. Resp. No. 9; Burk Dep. at 20-25, 28, 37-38; Limbach Dep. at 34-35; Neatrour Dep. at 55-56.  Aesthetic impacts, such as the orange discoloration from iron, serve to remind them of impacts that are not visible.  Pl. Int. Resp. No. 9; Burk Dep. at 20-25; Limbach Dep. at 35; Neatrour Dep. at 24-26; 55-56.[46]

As a result, David Neatrour would like to become more involved in canoeing on the Conemaugh River but refrains because he knows the river is polluted by metals.  Neatrour Dep. at 40-42.  He also refrains from collecting edible plants such as cattails from the river, out of concern for the metals they may contain.  Neatrour Dep. at 54.

Kurt Limbach has learned to wear old clothes when kayaking on the river because the orange iron oxide that coats river rocks and sediments will stain clothing.  Pl. Int. Resp. No. 9; Limbach Dep. at 35.  He sees herons only in isolated areas of the Conemaugh, where clean water enters the river.  Pl. Int. Resp. No. 9; Limbach Dep. at 51-52.   He would like to fish in the Conemaugh, but is concerned that it may not be safe to consume the fish caught there.  Pl. Int. Resp. No. 9; Limbach Dep. at 28-31.

Although Mike Burk finds the orange discoloration of the river less pronounced than it was years ago, he is concerned that the ongoing discharges of metals prevent fish and wildlife, including water birds, from flourishing in the Conemaugh River.  Pl. Int. Resp. No. 9; Burk Dep at 29-30.  Learning about the pollution from the CGS has changed the way he uses and

---

[46] All three are also concerned about the impact of Reliant's wastewater violations on their community's economy.  Pl. Int. Resp. No. 9; Neatrour Dep. at 73-75; Limbach Dep. at 31.  They believe that remediating the past pollution is an important component of the economic revitalization of the area, because the Conemaugh River valley offers exceptional and varied outdoor activities that could support tourism and other commercial non-industrial uses of the landscape.  Pl. Int. Resp. No. 9; Neatrour Dep. at 73-75; Limbach Dep. at 31.

experiences the Conemaugh:  "I love [Packsaddle Gap], and I probably don't paddle it as much as I would, knowing about the water quality."  Burk Dep. at 35-38; Pl. Int. Resp. No. 9.

Such "reasonable" concerns are sufficient to establish injury in fact.  Laidlaw, 528 U.S. at 184-85 ("[W]e see nothing 'improbable' about the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of that waterway and would subject them to other economic and aesthetic harms.");  Interfaith Community Org. v. Honeywell Int'l, Inc., 399 F.3d 248, 255-57 (3d Cir. 2005).  Indeed, Reliant admits that Plaintiffs' evidence of harm to their aesthetic interests satisfies the injury in fact requirement.  Def. Mem. at 33-34.

To undermine the significance of this undisputed testimony, Reliant depends almost exclusively on a single Third Circuit case, PIRG v. Magnesium Elektron, Inc., 123 F.3d 111 (3rd Cir. 1997).  Def. Mem. at 31-35.  Reliant's reliance, however, is misplaced:  Magnesium Elektron is no longer good law for this purpose, because it conflates proof of harm to the *river* with proof of harm to the *plaintiffs*; it is the latter that is required for standing.  Compare 123 F.3d at 121, with Laidlaw, 528 U.S. at 181 (to insist upon showing injury to the environment "as part of the standing inquiry … is to raise the standing hurdle higher than the necessary showing for success on the merits in an action alleging noncompliance with an NPDES permit"); see Honeywell Int'l, 399 F.3d at 255.[47]

Third, citizens have standing to enforce reporting and monitoring requirements of NPDES permits where they have aesthetic and other environmental interests in the receiving waters and show that they are injured by the lack of information resulting from violations.  See

---

[47] In any event, Plaintiffs have provided sufficient evidence of harm to the Conemaugh River to meet even Magnesium Elektron's test.  Reliant agrees that the river is impaired by excessive levels of metals.  Def. Mem. at 3-4; Pa. List of Impaired Waters (Pl. Ex. 2).  And Reliant admits that the concentrations of metals in its effluent frequently exceed permit limits, Kratka Dec. ¶¶ 11-12 – limits that are set so as to prevent violations of water quality standards in the receiving water.  These admissions establish that the CGS discharges contribute, at least to some extent, to the river's impairment.  Compare Magnesium Elektron, 123 F.3d at 116, 121 (uncontroverted expert testimony established no perceptible impacts or harm to the water body in which plaintiffs had an interest).

Sierra Club v. Simkins Indus., Inc., 847 F.2d 1109, 1113 (4th Cir. 1988).  Reliant's failure to

accurately monitor the amount of mercury in its wastewater discharges deprives members of the

Plaintiff groups of information relevant to their interest in the river, see, e.g., Limbach Dep. at

28-31 (concerns about safety of Conemaugh River fish).  Reliant's monitoring violations also

injure the groups themselves by depriving them of statutorily required information that they rely

on to educate the public and to take action to address water quality threats in Pennsylvania, as

with PennEnvironment's "Troubled Waters" report.  Pl. Int. Resp. No. 16; Masur Dep. at 14, 22-

23; Wolper Dep. at 17.  See American Canoe Ass'n, Inc. v. City of Louisa Water & Sewer

Comm'n, 389 F.3d 536, 544, 546 (6th Cir. 2004); 33 U.S.C. § 1318(a)-(b).

  **B. PLAINTIFFS' INJURIES ARE TRACEABLE TO RELIANT'S CLEAN
   WATER ACT VIOLATIONS.**

  The "fairly traceable" requirement is met when plaintiffs "show there is 'a substantial

likelihood' that defendant's conduct caused plaintiffs' harm.'"  Powell Duffryn, 913 F.2d at 72

(quoting Duke Power v. Carolina Envtl. Study Group, Inc., 438 U.S. 59 (1978)).  Plaintiffs do

not need to prove "to a scientific certainty that defendants' effluent, and defendants' effluent

alone, caused the precise harm suffered by plaintiffs."  Id. at 72.  The "fairly traceable"

requirement is not equivalent to the higher proximate causation requirement applied in tort cases.

Pennsylvania PIRG v. P.H. Glatfelter Co., 128 F. Supp. 2d 747, 754-55 (M.D. Pa. 2001).

  Here, as described above, Plaintiffs' injuries result from excessive levels of metals in the

Conemaugh River, metals that come from numerous sources.  Reliant's own monitoring reports

establish that the Conemaugh Generating Station is one of those sources.  Kratka Dec. ¶¶ 11-12.

The fact that Plaintiffs have not specified the exact contribution made by the plant's illegal

discharges, see Def. Mem. at 19, 34, is immaterial:  "Rather than pinpointing the origins of

particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that

causes or contributes to the kinds of injuries alleged in the specific geographic area of concern."

Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 162 (4th Cir. 2000);

Powell Duffryn, 913 F.2d at 72-73 & n.10; GAF Corp., 770 F. Supp. at 952-53 (rejecting

argument that "the violation [must be] so great or the waterway so small that the direct impact of the discharges [can] be pinpointed").[48]

Reliant's inadmissible and misleading "net reduction" analysis, see pp. 5-8, above, which sidesteps the crucial fact that its effluent exceeds water quality-based concentration limits, is both factually untrue and legally irrelevant.[49]

### C.    THIS COURT CAN REDRESS PLAINTIFFS' INJURIES.

The Plaintiff groups and their members know that reducing pollutant discharges into the Conemaugh can restore the river to health.  Pl. Int. Resp. No. 9; Limbach Dep. at 41-42; Neatrour Dep. at 66-67; Burk Dep. at 29.  This underlies their active involvement in organizations trying to clean up and protect the Conemaugh River and its tributaries, Pl. Int. Resp. No. 9; Burk Dep at 13, 29, 32; Limbach Dep. at 30, 47, and their decisions to participate actively in this lawsuit upon learning that the Conemaugh Generating Station's own monitoring data revealed it was exceeding NPDES limits designed to prevent violations of water quality standards in the river, Burk Dep. at 10; Limbach Dep. at 15-16; Neatrour Dep. at 16-19.[50]

The Plaintiff groups and the individual members each testified that if Reliant were to comply with its permit, this would reduce the amount of metals Reliant adds to the river and help address their concerns.  Burk Dep. at 31-33; Limbach Dep. at 45; Neatrour Dep. at 66-68; Masur Dep. at 25-27.  As Mr. Limbach put it, "[a]nybody that has something between their ears would realize putting less pollutants into a river would make it better."  Limbach Dep. at 29-30.  In

---

[48] The fact that the current levels of some metals in the river may be lower than historic levels, see Def. Mem. at 34, has no bearing on whether Reliant's discharges contribute to the metals still present in the river *today*.

[49] As Kurt Limbach explained, the issue is not "whether they're removing stuff.  It's whether they're in compliance with the Clean Water Act and their permit."  Limbach Dep. at 41.

[50] Mr. Burk and Mr. Neatrour learned of the NPDES permit violations at a meeting with PennEnvironment Director David Masur, which was also attended by PennEnvironment's legal counsel.  Burk Dep. at 7-8, 10-11, 14-15; Masur Dep. at 21-22; Neatrour Dep. at 16-18.  Mr. Limbach read about the lawsuit in an electronic newsletter he receives as a member of PennEnvironment.  Mr. Limbach then contacted Mr. Masur at PennEnvironment to get involved. Limbach Dep. at 15-16; Masur Dep. at 22.

addition, Mr. Limbach believes that Reliant's permit violations set a bad example.  Pl. Int. Resp.
No. 9.  New industries, such as natural gas drilling, are growing in western Pennsylvania and
could discharge more pollution to the Conemaugh, and he is concerned that the river will not
recover unless new *and* existing industries comply with their Clean Water Act permits.  Id.

An order from this Court requiring Reliant to comply with its NPDES discharge limits on
a more expedited basis than the leisurely and open-ended schedule contemplated by the COA,[51]
see pp. 8-10 above, would redress Plaintiffs' injuries.[52]  See Powell Duffryn, 913 F.2d at 73
("Where a plaintiff complains of harm to water quality because a defendant exceeded its permit
limits an injunction will redress that injury at least in part."); Georgia-Pacific Corp., 615 F. Supp.
at 1424 (relief sought need not "correct all related harm jointly caused by a series of actors").
Potential injunctive relief could also include an order that Reliant undertake efforts to remediate
the impacts of its violations.  See United States PIRG v. Atlantic Salmon of Maine, LLC, 339
F.3d 23, 31 (1st Cir. 2003).

This Court also can redress Plaintiffs' injuries by imposing a civil penalty, which would
"promote immediate compliance by limiting the defendant's economic incentive to delay its
attainment of permit limits" and would deter future violations.  Laidlaw, 528 U.S. at 185; see
also Powell Duffryn, 913 F.2d at 73.  Reliant's claim that a "duplicative" fine from this Court
would interfere with its ability to comply, Def. Mem. at 37, is both specious (there have been no
other fines) and troubling (Reliant's duty to comply with its permit is not mitigated by, of all
things, a Court-ordered penalty for past non-compliance).  See Elf Atochem, 817 F. Supp. at

---

[51] DEP does not share Reliant's qualms about the potential for "inconsistent obligations," Def.
Mem. at 36, imposed by this Court.  See Harper Letter (Def. Ex. 32), at 2.  The obligations of a
more aggressive compliance mandate, for example, are not necessarily "inconsistent" with those
of a slower one.

[52] Despite the 2004 COA, Reliant did not begin complying with its mercury monitoring
requirement until after Plaintiffs sued, see Teitt Dec. (Def. Ex. 2) ¶ 52, and after Plaintiffs alerted
DEP that compliance was feasible, see Pl. Ex. 12.  An injunction or civil penalty from this Court
may thus be required to ensure continued compliance with that monitoring requirement.

1171-72 (civil penalty can redress citizens' injuries despite prior $275,000 state-imposed penalty).

> **D.     THE PLAINTIFF ORGANIZATIONS HAVE STANDING TO SUE ON BEHALF OF THEIR MEMBERS.**

To have standing, an organizational plaintiff must show that (1) its members would otherwise have standing to sue in their own right; (2) the interests that the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  See Hunt v. Washington State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977).  As set forth above, the identified members of PennEnvironment and the Sierra Club individually meet the standing requirements, and Reliant does not dispute that the interests sought to be protected are germane to the organizations' purposes, see p. 11-12, above.  Moreover, the participation of individual members as parties to the action is not necessary.  The relief sought does not require individualized proof, and Plaintiffs do not seek individual damages, but instead an injunction and civil penalties that would address Reliant's violations in a manner that would benefit all PennEnvironment and Sierra Club members who have been injured.  Compare Hunt, 432 U.S. at 344.

## CONCLUSION

For the reasons set forth above, the Court should deny Reliant's motion.


Respectfully submitted,


April 30, 2009                          /s/ Joshua R. Kratka
                                        Thomas Farrell (PA ID No. 48976)
                                        Farrell, Reisinger & Stallings, LLC
                                        1000 Koppers Building
                                        436 7th Avenue
                                        Pittsburgh, Pennsylvania 15219-1827
                                        (412) 894-1380 (phone)
                                        (412) 894-1381 (fax)

                                        Joshua R. Kratka (MA ID No. 544792)
                                        Theresa Labriola (MA ID No. 662262)
                                        National Environmental Law Center
                                        44 Winter Street, 4th Floor
                                        Boston, Massachusetts  02108
                                        (617) 747-4333 (phone)
                                        (617) 292-8057 (fax)

                                        Counsel for Plaintiffs PennEnvironment
                                         and Sierra Club


## CERTIFICATE OF SERVICE

I hereby certify that today I served a true and correct copy of the foregoing

Memorandum in Opposition to Motion to Dismiss along with the Declaration of Joshua R.

Kratka and all exhibits by making them available on the Court's electronic case filing system.

April 30, 2009                          /s/ Theresa Labriola
                                        Theresa Labriola