IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PENNENVIRONMENT and           )
SIERRA CLUB,                   )
                   Plaintiffs, )
                               )
        vs.                    )      Civil Action No. 07-475
                               )      Chief Magistrate Judge Amy Reynolds Hay
RRI ENERGY NORTHEAST           )
MANAGEMENT COMPANY,            )
                   Defendants. )


## MEMORANDUM OPINION

HAY, Chief Magistrate Judge

            Plaintiffs commenced this citizen suit against defendant RRI Energy Northeast

Management Company ("RRI"),[1] in an effort to secure RRI's compliance with the Clean Water

Act ("CWA"), 33 U.S.C. §§ 1251, et seq, and the Pennsylvania Clean Streams Law ("PCSL"), 35

Pa. C.S. §§ 691.1, et seq. Plaintiffs allege that RRI has been discharging illegal levels of at least

five different metals into the Conemaugh River from its Conemaugh Generating Station ("CGS")

in West Wheatfield Township, Pennsylvania, in violation of its wastewater discharge limits.

I.      Background

            It is undisputed that RRI discharges industrial wastewater into the Conemaugh

River and, consequently, that it is subject to the National Pollutant Discharge Elimination System

_____

            [1]Although the named defendants in this case, as it was originally filed, were Reliant Energy, Inc.
and Reliant Energy Northeast Management Company, Reliant Energy Northeast Management Company
subsequently filed a motion to amend the caption to reflect the fact that it had recently changed its name
to RRI Energy Northeast Management Company and that Reliant Energy, Inc. had been dismissed from
the case [Dkt. 45]. See [Dkt. 38]. That motion was granted on May 28, 2009, and the Clerk of Court was
simultaneously ordered to amend the caption accordingly [Dkt. 48]. As such, to limit any confusion, the
Court has referred to the defendant as "RRI" throughout the opinion notwithstanding that it has only
recently changed its name.

("NPDES"), a federal program established in section 402 of the CWA, 33 U.S.C. § 1342, to regulate the discharge of such pollutants. It is also undisputed that the Pennsylvania Department of Environmental Protection ("PADEP"), administers the NPDES in Pennsylvania, and that on December 27, 2001, the PADEP approved RRI's renewal application for a NPDES permit authorizing RRI's CGS to release wastewater into the Conemaugh River subject to certain effluent standards and limitations and monitoring requirements. See Def. Exh. 9: Permit No. PA 005011 ("2001 Permit"). The 2001 Permit was to become effective on February 1, 2002, and was to expire on December 27, 2006. Id.

On January 31, 2002, RRI filed an appeal with the Pennsylvania Environmental Hearing Board ("PAEHB"), challenging some of the 2001 Permit requirements. On December 28, 2004, RRI and the PADEP entered into a Consent Order and Agreement ("COA"), settling the appeal. See Def. Exh. 10: Notice of Appeal; Def. Exh. 12: COA. Amongst other things, the COA modified the compliance schedule set forth in the 2001 Permit giving RRI until February 1, 2011 to comply with the final water quality based effluent limitations listed in the COA. In addition, under the terms of the COA, the PADEP was required to publish an amendment to the 2001 Permit in the *Pennsylvania Bulletin* and, after time for review and comment, issue an amended permit incorporating the terms and conditions set forth in the COA. The proposed amendment was, in fact, published in the *Pennsylvania Bulletin* on December 18, 2004, and on January 31, 2005, an amended permit was issued.[2] See Def. Exh. 14: 34 PA. BULL. 51 (Dec. 18,

---

[2]Although RRI has represented on page 11 of its brief that the proposed amendment published in the *Pennsylvania Bulletin* includes "an invitation for review and comment by interested parties," the Court is unable to locate any such statement in the copy of the *Bulletin* submitted and relied upon by RRI. See Def. Exh. 14. Moreover, plaintiffs have submitted a declaration from their counsel, Joshua R. Kratka, in which he states that after conducting a search of the PADEP's files, that of the EPA and the

2004). Since that time, according to RRI, it has been performing studies and collecting data in order to assess potential treatment technologies and support the development of proposed revised effluent limitations. See Def. Brief, pp. 9-16.

Nevertheless, on February 6, 2007, plaintiffs submitted a notice of intent to sue to RRI, the PADEP and the EPA in accordance with section 505 of the CWA, 33 U.S.C. § 1365, and commenced the instant action on April 10, 2007. In the interim, on April 5, 2007, the PADEP filed a civil action against RRI under the PCSL in the Court of Common Pleas of Indiana County, Pennsylvania, alleging that between February of 2002 and October of 2006, RRI was discharging wastewater into the Conemaugh River contrary to the CWA and/or the terms and conditions of the 2001 Permit. Amongst other things, the PADEP asked the court for injunctive relief and to assess civil penalties against RRI. See Pls.' Exh. 13a: State Court Complaint. On May 3, 2007, pursuant to a joint motion filed by the parties, an order staying all proceedings in this case was entered to allow the parties to explore settlement; it appears undisputed that a similar order was also entered in the state court action. See Pls.' Exh.14. Although settlement discussions ultimately proved unsuccessful, the PADEP nevertheless withdrew the state action on October 1, 2008. See Pls.' Exh. 15: Praecipe for Discontinuance. The stay of proceedings entered by this Court was lifted on November 25, 2008. See Dkt. 27.

On March 13, 2009, RRI filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) arguing that the Court is without jurisdiction as plaintiffs' citizen suit is barred under section 309(g)(6) of the CWA and that plaintiffs lack standing [ECF No. 34]. In a Memorandum

---

documents produced by RRI during discovery, they were unable to find any evidence that any public notice or opportunity to comment on the contents of the COA was provided by the PADEP. See Kratka Dec. ¶ 3.

Opinion issued on December 18, 2009 [ECF No. 51], the Court rejected RRI's argument that

plaintiffs' suit was barred under the CWA but nevertheless granted RRI's motion finding that

plaintiffs are without standing to pursue this action.  Plaintiffs subsequently filed a motion for

reconsideration of that finding arguing that the Court misapplied the standard applicable to

12(b)(1) motions and that, had the proper standard been utilized, the Court would have concluded

that plaintiffs had standing and that the Court had jurisdiction over the matter.  The Court was

persuaded by plaintiffs' argument and vacated its December 22, 2010 Memorandum Opinion

[ECF No. 51].  The instant opinion stands in its place and, thus, all of the issues raised by RRI in

its motion to dismiss have been revisited.

II.     Standard of Review

"Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a complaint for

lack of jurisdiction over the subject matter, or if the plaintiff lacks standing to bring his claim."

Samsung Electronics Co. v. ON Semiconductor Corp., 541 F. Supp. 2d 645, 648 (D. Del. 2008).

A 12(b)(1) motion may present either a facial or a factual challenge to the court's jurisdiction.

Petruska v. Gannon University, 462 F.3d 294, 302 n.3 (3d Cir. 2006).  Because a facial challenge

is one based purely on the allegations in the complaint, the court must accept those allegations as

true and may consider only the complaint and any documents upon which it is based.  Id.  Where,

however, subject matter jurisdiction is challenged in fact, i.e., where the challenge is based on the

sufficiency of jurisdictional fact, the court is not required to attach any presumptive truthfulness

to the allegations in the complaint and the plaintiff bears the burden of establishing that subject

matter jurisdiction exists.  Id.  See Ballentine v. United States, 486 F.3d 806, 810 (3d Cir. 2007).

The Court of Appeals for the Third Circuit has further explained that under the latter circumstances,

> If the defendant raises no challenge to the facts alleged in the pleadings, the court may rule on the motion by accepting the allegations as true. . . . If the defendant contests *any* allegations in the pleadings, by presenting evidence, the court must permit the plaintiff to respond with evidence supporting jurisdiction. . . . The court may then determine jurisdiction by weighing the evidence presented by the parties. . . .

Gould Electronics Inc. v. United States, 220 F.3d 169, 177 (3d Cir. 2000) (emphasis added) (internal citations omitted). Thus, "the allegations in the complaint are not controlling . . . and only uncontroverted factual allegations are accepted as true for purposes of the motion . . . . All other facts underlying the controverted jurisdictional allegations are in dispute and are subject to fact finding by the district court." Roush v. Horner, 2008 WL 189556 at *5 (W.D. Pa. Jan. 18, 2008), citing Cedars-Sinai Medical Center v. Watkins, 11 F.3d 1573, 1583 (Fed. Cir. 1993). See First Quality Baby Products, LLC. v. Kimberly-Clark Worldwide, Inc., 2009 WL 1675088 at * 2 (M.D. Pa. June 15, 2009).

Here, resolution of RRI's motion turns on the factual determination of whether the COA entered into between the parties constitutes the type of action that precludes a citizen suit under the CWA and whether plaintiffs have suffered an injury that is fairly traceable to RRI's conduct. RRI's motion, therefore, presents a factual challenge to the Court's jurisdiction. As such, only the factual allegations that are contested by defendant and supported by contrary evidence are at issue and the uncontroverted factual allegations in the complaint are accepted as true.

III.    Discussion

A.    Preclusion under the CWA

Under section 505(a)(1) of the CWA, citizen suits are authorized against defendants alleged to be in violation of the CWA, "except as provided in . . . section 1319(g)(6) of this title."[3] 33 U.S.C. § 1365(a).  Section 1319(g), which falls under the "Enforcement" section of the statute and is entitled "Administrative penalties," provides the EPA with the authority to assess administrative penalties against polluters without bringing suit against them.  Subsection 1319(g)(6)(A) sets forth certain limitations on that authority and other potential actions providing that:

any violation--

(i) with respect to which the Administrator or the Secretary has commenced and is diligently prosecuting an action under this subsection,

(ii) with respect to which a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection, or

(iii) for which the Administrator, the Secretary, or the State has issued a final order not subject to further judicial review and the violator has paid a penalty assessed under this subsection, or such comparable State law, as the case may be,

---

[3]A citizen suit is also precluded under section 1365(b) when proper notice of the alleged violation has not been given to the defendant or when "the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance."  Id.  See Proffitt v. Rohm & Haas, 850 F.2d 1007, 1011 (3d Cir. 1988).  Because it is not disputed that proper notice was given in this case and that neither the Administrator nor the State is presently prosecuting an action against RRI in any court, subsection (b) does not serve to bar the instant suit and is not at issue.

6

> shall not be the subject of a civil penalty action under subsection
> (d) of this section or section 1321(b) of this title or section 1365 of
> this title.

33 U.S.C. § 1319(g)(6)(A). Thus, a citizen suit under section 1365 is properly barred if, as here, civil penalties are sought and one of these three exceptions apply.

RRI contends that plaintiffs' suit is barred under subsection (ii). Specifically, RRI argues that the COA it entered into with the PADEP constitutes the "commencement" of an "action" and that the PADEP has been "diligently prosecuting" that action as evidenced by its on-going activities under the COA. As well, RRI contends that the PADEP's statutory and regulatory scheme is comparable to its federal counterpart thereby satisfying all the requirements of subsection 1319(g)(6)(A)(ii).

Plaintiffs, however, argue that section 1319(g)(6)(A) is wholly inapplicable and that the Court need not assess whether the state has commenced or is diligently prosecuting an action comparable to section 1319(g)(6). Plaintiffs contend that the only type of action that has preclusive effect under section 1319(g)(6) is an *administrative penalty* action and that, because the COA is merely an administrative compliance order which imposes no penalties, section 1319(g)(6) is not triggered. Looking at the CWA's enforcement scheme as a whole, the Court agrees.

First, by its plain language, section 1319(g)(6)(A)(ii), precludes citizen suits when the state "has commenced and is diligently prosecuting an action under a State law comparable to *this subsection*." "This subsection" is that which provides for the assessment of administrative penalties. It therefore follows that the action being pursued by the state must be one in which administrative penalties are sought in order for section 1319(g)(6)(A)(ii) to apply.

Indeed, as noted by the United States District Court for the District of Colorado, prior to the 1987 amendments to the CWA, the EPA had two enforcement options: it could issue a compliance order under section 1319(a), or bring a civil or criminal action in court under section 1319(b)-(d). Old Timer, Inc. v. Blackhawk-Central City Sanitation District, 51 F. Supp. 2d 1109, 1114 (D. Colo. 1999) (Old Timer, Inc."). Citizen suits were precluded only when the EPA or a state had already commenced and was diligently prosecuting a civil or criminal action "in a court;" they were not precluded where the EPA sought to enforce the CWA by issuing a compliance order. Id. See 33 U.S.C. § 1365(b).

The amendments to the CWA, enacted in 1987, added subsection 1319(g) which, as previously discussed, gives the EPA the authority to assess administrative penalties without bringing a court action. As noted by the court in Old Timer, Inc., there is again no provision that precludes a citizen suit when the EPA issues a compliance order under section 1319(a). Old Timer, Inc., 51 F. Supp. 2d at 1114. Moreover, the court found that "by specifying that state action, to be preclusive, must have been brought under a law comparable to subsection (g), without mentioning subsection (a) compliance actions, Congress expressed its intent to preclude citizen actions only when the state is actively seeking an administrative penalty." Id. Thus, the court concluded that citizen suits are only precluded under the amendments "when the EPA or a state has commenced an action under the administrative penalty subsection or a comparable state statute, or when administrative penalties have been assessed and paid." Id. See 33 U.S.C. § 1319(g)(6)(A). Because the state had not yet commenced an action for administrative penalties, the court found that the plaintiff's citizen suit was not precluded under section 1319(g)(6)(A)(ii).

Similarly, in <u>Washington Public Interest Research Group v. Pendelton Woolen Mills</u>, 11 F.3d 883 (9th Cir. 1993), the court declined to find that the citizen suit was precluded under section 1319(g)(6) noting that section 1319(g) only deals with administrative penalty actions, and that it was "unaware of any legislative history demonstrating a congressional intent to extend the bar on citizen suits created in section 1319(g)(6)(A) to a context other than an administrative penalty action." <u>Id.</u> at 885. Although the case turned on whether the suit was barred under subsection (i) rather than (ii), the Court did not confine its comments to subsection (i) but referred to section 1319(g)(6)(A) as a whole. Indeed, the court described section 1319(g) generally as providing "protections ensuring that administrative penalties will not be duplicative of other penalties imposed on a person who violates the Act." <u>Id.</u> Thus, section 1319(6)(g)(A) only serves to bar a citizen suit where administrative penalties are already being sought or have already been imposed by the EPA or the state. <u>See</u> <u>Knee Deep Cattle Co. v. Bindana Investment Co.</u>, 94 F.3d 514, 516 (9th Cir. 1996), <u>citing</u> <u>Citizens for a Better Environment-California v. Union Oil Co.</u>, 83 F.3d 1111, 1115 (9th Cir. 1996) ("[F]or § 1319(g)(6)(A) to apply, the comparable state law must contain penalty provisions and a penalty must actually have been assessed under the state law"); <u>Oregon State Public Interest Research Group, Inc. v. Pacific Coast Seafoods Co.</u>, 341 F. Supp. 2d 1170, 1175-76 (D. Or. 2004), <u>citing</u> <u>Sierra Club v. Hyundai America, Inc.</u>, 23 F. Supp. 2d 1177, 1181 (D. Or. 1997) ("[T]he provisions of Section 1319(g)(6) are designed to preclude citizen suits that would be duplicative of an administrative penalty action . . ."); <u>Friends of Santa Fe County v. LAC Minerals, Inc.</u>, 892 F. Supp. 1333, 1347 (D.N.M. 1995) ("[S]ection 1319(g)(6)(A)(ii) is narrowly drawn; its preclusionary effect applies only when the EPA ... or a state is in the process of collecting or has already collected

administrative penalties"); <u>Molokai Chamber of Commerce v. Kukui (Molokai), Inc.</u>, 891 F. Supp. 1389, 1403-05 (D. Haw. 1995) (Finding that the language of the statute requires the state to seek penalties before a citizen suit is barred); <u>Coalition for a Liveable West Side, Inc. v. New York City Department of Environmental Protection</u>, 830 F. Supp. 194, 197 (S.D.N.Y. 1993) ("As written, § 1319 (g)(6) ensures that an entity that has violated the CWA will not be subjected to duplicative civil penalties for the same violations"); <u>Public Interest Research Group of New Jersey, Inc. v. New Jersey Expressway Authority</u>, 822 F. Supp. 174, 184 (D.N.J. 1992 (Finding section 309(g) inapplicable where, <u>inter alia</u>, no state administrative enforcement action was ever formally commenced and no civil penalties were assessed).

Here, RRI does not contend, nor can it, that the COA that it entered into with the PADEP to resolve its appeal regarding the terms of the 2001 Permit constitutes an action commenced by the state to obtain administrative penalties for RRI's violations of the 2001 Permit. Indeed, RRI describes the COA merely as establishing "compliance schedules and milestones, in order allow for the scientifically valid and appropriate development of NPDES permit effluent limits" and allowing "time for the development of treatment technologies." Def. Brief, pp. 10-11. Indeed, no penalties were assessed. The penalties sought by plaintiffs, therefore, are not -- indeed, cannot be -- duplicative of any penalties imposed on RRI.[4] Moreover, the COA was not the result of an action commenced by the state to address violations

---

[4]Although the COA contemplates stipulated penalties should RRI fail to comply with the COA, such penalties for future violations of a negotiated order, are clearly not the type of penalties contemplated under section 1319(g)(6). Not only does section 1319(g) generally speak to violations that have already occurred but any penalties that may be sought in the future are necessarily not now being "diligently prosecuted." <u>See</u> <u>Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.</u>, 484 U.S. 49, 63 n.4 (1987 ); <u>Knee Deep Cattle Co. v. Bindana Investment Co.</u>, 94 F.3d at 516-17 (stipulated penalties for violations of negotiated consent order do not trigger section 1319(g)(6)).

of the 2001 Permit but, rather, was executed in an effort to resolve RRI's administrative appeal

filed with the Pennsylvania Environmental Hearing Board challenging some of the 2001 Permit

requirements. As such, section 1319(g)(6)(A)(ii) does not preclude plaintiffs' case from going

forward.

Further, as plaintiffs have argued, the legislative history, which RRI has not

addressed at all, only bolsters the Court's conclusion. As set forth by the court in Old Timer,

Inc.:

> The language of § 1319(g) was first proposed in the Water Quality
> Act of 1986, which was vetoed by President Reagan. The language
> was then included verbatim in the Water Quality Act of 1987. The
> 1986 House Conference Report, approved unanimously by both
> House and Senate, described the citizen preclusion language
> (incorporated into the final product) as follows:
>
>> No one may bring an action to recover civil
>> penalties under sections 309(b) and (d), 311(b), or
>> 505 [citizen suits] of this Act for any violation with
>> respect to which the Administrator has commenced
>> and is diligently prosecuting *an administrative civil
>> penalty action*, or for which the Administrator has
>> issued a final order not subject to further judicial
>> review (and for which the violator has paid the
>> penalty). *This limitation applies only to an action
>> for civil penalties for the same violations which are
>> the subject of the administrative civil penalty
>> proceeding*. It would not .... apply to: 1) an action
>> seeking relief other than civil penalties (e.g., an
>> injunction or declaratory judgment); 2) *an action
>> under section 505(a)(1) of this Act filed prior to
>> commencement of an administrative civil penalty
>> proceeding for the same violation;* or 3) a violation
>> which has been the subject of a notice of violation
>> under section 505(b)(1) of this Act prior to initiation
>> of the administrative penalty process, provided that,
>> in the latter case, an action under section 505(a)(1)
>> of this Act is filed within 120 days of the notice of

> violation.... The Agency can prevent duplicate
> proceedings by intervening in the ongoing citizen
> enforcement suit or by bringing its own judicial
> action before a citizen suit is filed.

> H.R. Conf. Rep. No. 99-1004, at 133 (1986) (emphasis added).

Id. at 1114-15.  Based on these comments it appears clear that the import of section

1319(g)(6)(A) is to prevent the duplicate civil penalties from being imposed.  See Pls.' Exh. 17:

S. Rep. No. 99-50, p. 28 (" This amendment therefore strikes the balance between two competing

concerns: The need to avoid placing obstacles in the path of such citizen suits and the desire to

avoid subjecting violators of the law to *dual* enforcement actions or penalties for the same

violation").

> Indeed, the Court in Old Timer, Inc., went on to note that:

> When introducing the final bill to the Senate in 1987, Senator
> Chaffee, who was the primary drafter and chairperson of the Senate
> conferees, described the citizen preclusion provision as follows:

>> New paragraph 309(g)(6) sets out limitations that
>> preclude citizen suits where the Federal
>> Government or a State has commenced and is
>> diligently prosecuting *an administrative civil
>> penalty action* or has already issued a final
>> administrative civil penalty order not subject to
>> further review and the violator has paid the penalty
>> .... under a State law that is comparable to section
>> 309(g).  For example, in order to be comparable, a
>> State law must provide for a right to a hearing and
>> for public notice and participation procedures
>> similar to those set forth in section 309(g); it must
>> include analogous penalty assessment factors and
>> judicial review standards; and it must include
>> provisions that are analogous to the other elements
>> of section 309(g) ....  Finally, section 309(g)(6)(A)
>> provides that violations with respect to which a
>> Federal or State *administrative penalty action* is

> being diligently prosecuted or previously concluded
> "shall not be the subject of" civil penalty actions
> under sections 309(d), 311(b), or 505 [citizen suits].
> This language is not intended to lead to the
> disruption of any Federal judicial penalty action
> then underway, but *merely indicates that a Federal
> judicial civil penalty action or a citizen suit is not to
> be commenced if an administrative penalty
> proceeding is already underway.*

133 Cong.Rec. 1264 (1987) (emphasis added).

Id. at 1114-15. See United States v. BP Oil, Inc., 1989 WL 83623, at *3 (E.D. PA. July 27,

1989), quoting 133 Cong.Rec. 5737 (daily ed. Jan. 14, 1987) (statement of Sen. Chaffee)

("'[Subsection 1319(g) ] . . . merely indicates that a Federal judicial civil penalty action or a

citizen suit is not to be commenced if an administrative *penalty* proceeding is already underway")

(emphasis added).  See also Pls.' Exh. 19: H.R. Rep. No. 99-189, p. 32 ("The citizen suits

provision in section 505(b)(1) . . . is amended to provide that no action can be commenced be a

citizen if the Administrator or state has commenced and is diligently pursuing the assessment of a

civil penalty"); Pls.' Exh. 20: EPA, Guidance on State Action Preempting Civil Penalty Actions

Under the Federal Clean Water Act, pp. 2, 6  (Aug. 28, 1987) (Quoting Senator Chaffee's

remarks that the 1987 amendment indicates only that a citizen suit is not to be commenced if an

administrative penalty proceeding is already underway and summarizing that a federal judicial

penalty action will only be preempted where the state has collected or is diligently pursuing an

appropriate and adequate administrative penalty).

The Court in Old Timer, Inc. therefore concluded, understandably so, that

Congress did not intend for section 1319(g)(6)(A)(ii) to preclude citizen suits when an

administrative penalty proceeding has not yet been commenced as of the suit's filing.  Id. at 1115.

Because the state Water Quality Control Division in that case had only issued an administrative compliance order to the defendant and had not sought civil penalties, the court found that section 1319(g)(6)(A)(ii) did not apply. Id.

RRI's arguments to the contrary are not persuasive. Although RRI argues that "Courts have *uniformly* held that filing of an administrative consent order qualifies as the sort of administrative action that bars a citizen suit," see Def. Brief, p. 25 (emphasis added), it cites only one case to support that position. Moreover, in that case, Arkansas Wildlife Federation v. ICI Americas, Inc., 29 F.3d 376 (8th Cir. 1994) ("Arkansas Wildlife Federation"), the Consent Administrative Order at issue imposed administrative penalties. Id. at 378. Because administrative penalties had already been assessed, the citizen suit would have subjected the defendant to duplicative civil penalties, unlike in this case.

In addition, the agreement in Arkansas Wildlife Federation was entered into only after the state informed the defendant that it was subject to enforcement action under state law having unsuccessfully issued non-compliance notices to the defendant for over two years. Id. at 377-78. The state, therefore, had taken steps toward assessing civil penalties. Here, in contrast, the COA was not entered into because the PADEP was exercising, or even threatening to exercise, its enforcement powers under state law. Rather, the COA was entered into in order to resolve the administrative appeal filed by RRI. See Def. Exh 12: The COA.[5] Hence, the PADEP

_____

[5]Further, to the extent that RRI has suggested that section 1319(g) authorizes the issuance of compliance orders and, thus, that any sort of administrative action precludes a citizen suit, it is clear that compliance orders are permitted under subsection (a), not subsection (g). See Def. Brief, p. 21. Moreover, as pointed out by plaintiffs, section 505, which grants citizens the right to commence an action to enforce compliance orders issued by the EPA or a state, would be rendered meaningless if the issuance of a compliance order precluded citizen suits. 33 U.S.C. § 1365(a)(1)(B). See Washington Public Interest Research Group v. Pendelton Woolen Mills, 11 F.3d at 886 ("[I]f Congress had intended to

was not exercising its enforcement powers under a comparable state law or pursuing administrative penalties thereby rendering section 1319(g)(6)(A) inapplicable.  See Tobyhanna Conservation Association v. Country Place Waste Treatment Co., 734 F. Supp. 667, 670 (M.D. Pa. 1989) (Rejecting defendant's argument that citizen suit was precluded under section 1319(g)(6)(A)(ii) where, although an Administrative Conference had been set, no order had been issued assessing a civil penalty).

RRI also makes much of the fact that the language in subsection (ii), differs from that in (i) and (iii) in that it requires only that the state be pursuing an action under state law that is "*comparable* to this subsection," and does not say that the state must be prosecuting an action *for penalties* under State law or "an action under State law comparable to *an action under this subsection*," as subsections (i) and (iii) do.  RRI contends that because the other two subsections explicitly tie the assessment or payment of administrative penalties to section 1319(g)(6)'s preclusive bar, the absence of such explicit language in (ii) suggests that Congress did not intend (ii)'s bar to be so restrictive.

RRI's argument, however, overlooks the context in which the entire limitation provision appears as well as the legislative history.  As previously discussed, subsection (g) is the statutory provision that provides for the assessment and imposition of "Administrative penalties." As such, any reference to an action under a state law that is "comparable to this subsection" necessarily means an action in which administrative penalties are being sought.  See Oregon State Public Interest Research Group, Inc. v. Pacific Coast Seafoods Co., 341 F. Supp. 2d at 1175

_____

preclude citizen suits in the face of an administrative compliance order, it could easily have done so, as it has done in certain other environmental statutes").

("Section 1319(g)(6) provides that there must be prior commencement of *administrative penalty actions* under *comparable state law* before CWA penalty actions are precluded") (emphasis added).

Moreover, looking at subsection (g)(6)(A) as a whole it is clear that it is intended to limit actions where administrative penalties are already being sought, whether under federal or state law, or where they have already been imposed under federal or state law. Subsection (i) covers actions being pursued by the EPA under the CWA; subsection (ii) covers actions being pursued by the state under state law; and (iii) covers instances where proceedings under (i) or (ii) have already concluded and administrative penalties have already been imposed. Congress was clearly unable to reiterate "under this subsection" in subparagraph (ii) because it was covering instances where proceedings had been commenced under state law, not the CWA. In order to encompass *state* actions in which penalties were being sought, Congress simply conformed the language in subsection (ii) to include actions "under a State law comparable to this subsection." It did not alter the fact that preclusion under section 1319(g)(6)(A) is predicated on the assessment of administrative penalties.

Indeed, subsection (iii), which RRI acknowledges is explicitly tied to the payment of administrative penalties, incorporates the language from *both* (i) and (ii), stating that citizen suits are precluded where "the violator has paid a penalty assessed *under this subsection* or *such comparable State law*" depending on which government entity has already imposed civil penalties. 33 U.S.C. § 1319(g)(6)(A)(iii). Having tied "this subsection," under which administrative penalties are sought and imposed, to a "comparable state law" it is clear that

Congress intended that the comparable state law must be one in which administrative penalties are being sought.

Nor does <u>North & South Rivers Watershed Association v. Town of Scituate</u>, 949 F.2d 552 (1st Cir. 1991) ("<u>Scituate</u>"), upon which RRI relies, or the cases which have followed its reasoning, compel a different result. <u>Scituate</u>'s conclusion that civil penalties need not have been assessed in order for section 1319(g)(6)(A)(ii) to preclude a citizen suit was made without any discussion at all of section 309(g) generally or the context in which it appears in the statute. Moreover, the court expressly declined to consider the legislative history which, as previously discussed, quite obviously indicates that it was Congress' intent to prevent the duplication of civil penalties and to preclude a citizen suit seeking penalties if the state is already doing so. <u>Id.</u> at 555 n.6. It is also clear that the holding in <u>Scituate</u> has since been called into question by other courts and repudiated by the EPA. <u>See</u> <u>Citizens for a Better Environment-California v. Union Oil Co.</u>, 83 F.3d at 1118 (Rejecting the holding in <u>Scituate</u> finding that the "comparable state law" language found in both subsections (ii) and (iii), means that penalty must have been assessed under a state law that is comparable to section 1319(g)); <u>Coalition for a Liveable West Side, Inc. v. New York City Department of Environmental Protection</u>, 830 F. Supp. at 197 ("I find no basis for the First Circuit's redrafting of the statute. . . . As written, § 1319(g)(6) ensures that an entity that has violated the CWA will not be subjected to duplicative civil penalties for the same violations"). Indeed, in March of 1993, the EPA issued a supplement to the guidance document it issued in 1987 shortly after the 1987 Amendments were added, to address <u>Scituate</u>, - - an opinion it clearly found to be a wrongly decided. Pls.' Exh. 21: EPA Supplemental Guidance on Section 309(g)(6)(A) of the Clean Water Act (Mar. 5, 1993). The EPA's remarks

began by unequivocally stating that "[u]nder section 309(g)(6)(A)(ii), EPA may not initiate a civil penalty action under sections 309(d) or 311 of the Clean Water Act if a state has commenced and is diligently prosecuting an *administrative penalty action* of its own for the same violations . . . ." Id. (emphasis added). Under these circumstances, the import of Scituate is suspect at best and does not, in this Court's view, overcome the plain language of the statute, the legislative history or the logic of the cases discussed above that have come to a contrary conclusion.[6]

B.      Standing

RRI also argues that plaintiffs lack standing to bring this lawsuit. The law is not in dispute. Article III of the Constitution limits the jurisdiction of federal courts to "cases and controversies." Interfaith Community Organization v. Honeywell International, Inc., 399 F.3d 248, 254 (3d Cir. 2005). "One element of the case-or-controversy requirement is that plaintiffs must have standing to sue." Id., citing McConnell v. Federal Election Commission, 540 U.S. 93, 225 (2003). Where an organization has brought suit on behalf of its members, standing will be found where: (1) its members would otherwise have standing to sue in their own right; (2) the interests at stake are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc., 528 U.S. 167, 181 (2000).

---

[6]In this manner, Citizens for Clean Power v. Indian River Power, LLC, 636 F. Supp. 2d 351 (D. Del. 2009), a recent decision submitted by RRI, is easily distinguishable as well. Not only are violations of the Clean Air Act at issue rather than the CWA, but the consent decree in that case was a judicially enforceable agreement entered into to settle a law suit brought to enforce permit requirements and to penalize the defendant for its violations. Id. at 353, 354-55. Moreover, penalties were, in fact, imposed. Id. at 355.

In order to satisfy the first prong -- that the individual members of the

organization would have standing -- three elements must be met:

> First, the plaintiff must have suffered an "injury in fact" -- an
> invasion of a legally protected interest which is (a) concrete and
> particularized . . . and (b) "actual or imminent, not 'conjectural' or
> 'hypothetical[.]'" . . .  Second, there must be a causal connection
> between the injury and the conduct complained of -- the injury has
> to be "fairly ... trace[able] to the challenged action of the
> defendant, and not ... th[e] result [of] the independent action of
> some third party not before the court."  Third, it must be "likely,"
> as opposed to merely "speculative," that the injury will be
> "redressed by a favorable decision."

Lujan v. Defenders of Wildlife, 504 U.S. at 560-61 (internal citations omitted).  See Friends of

the Earth, Inc. v. Laidlaw Environmental Services, Inc., 528 U.S. at 180-81;  Interfaith

Community Organization v. Honeywell International, Inc., 399 F.3d at 254-55.  Moreover, it is

the plaintiff's burden to establish these elements.  Lujan v. Defenders of Wildlife, 504 U.S. at

561.

The initial question therefore is whether the individual members have suffered an

"injury in fact."  Although generalized grievances shared by the public at large are insufficient to

confer standing on individual plaintiffs, Public Interest Research Group of New Jersey, Inc. v.

Magnesium Elektron, Inc., 123 F.3d 111, 120 (3d Cir. 1997), citing Valley Forge Christian

College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 475 (1982),

where an environmental plaintiff has demonstrated that his or her use of the affected area has

been curtailed or that the aesthetic and recreational value of the area has been or will be lessened,

an injury in fact will be found.  Friends of the Earth, Inc. v. Laidlaw Environmental Services, 528

U.S. at 181-85.  Cf. Id. at 181 ("The relevant showing for purposes of Article III standing ... is not an injury to the environment but injury to the plaintiff").

Here, David M. Neatrour, who has lived along Tubmill Creek (a major tributary of the Conemaugh River) since 1972, testified at his deposition that he has been a member of the Sierra Club since 1990 and PennEnvironment since January of 2009.  Def. Exh. 34: Pls.' Int. Resp., No. 8; Def. Exh. 4: Neatrour Dep., p. 15.  He also testified that he has occasionally been canoeing or kayaking in the Conemaugh River; that he walks his dog along the river in the morning and is generally "uneasy" about the water; that at various times he has observed that the water is discolored, turbid or greenish, and "unhealthy looking;" that there are activities he hesitates doing and things he won't do in the river because he's concerned about the toxicity and potential threat to his health; that it would be out of the question for him to wade in the water; that he would be inclined to wade in the river or go canoeing or kayaking if he wasn't fearful of jeopardizing his health; that he avoids using the river; that his bird watching is curtailed because he doesn't like to spend too much time along the river; and that he collects herbs but stays away from collecting any along the Conemaugh River.  Id. at pp. 22-25, 35, 38, 40, 42, 44, 45, 46, 52, 53-4.  Mr. Neatrour also allowed that, although he was not directly affected economically by the condition of the Conemaugh River since he was not an outfitter or someone who benefitted financially from the river, his home and land values are effected by the vibrancy of the communities along the river.  Id. at 74.

Plaintiffs have also pointed to the deposition testimony of Michael Burk, who lives in Ebensburg, Pennsylvania and has been a member of the Sierra Club since January of this year and a member of PennEnvironment since November of 2006.  Def. Exh. 5: Burke Dep., p. 4;

Def. Exh. 8: Masur Dep., pp. 17, 40. Mr. Burk testified that he sees the effects of pollution by the stains on the rocks in the river, by the turbidity and brackishness of the water and by the metallic smell and taste downstream from the CGS; that he notices a difference in the distribution of river otters between the upstream and downstream reaches of the Conemaugh; that he is concerned about possible health related issues; and that the river's capacity as a recreational source and his enjoyment of the river has been diminished. Def. Exh. 5: Burke Dep., pp. 20, 24, 25, 32, 35-36, 37-39. Although Mr. Burke responded "No," when asked whether his overall frequency of paddling on the river had changed, he also testified that he doesn't paddle as much as he used to knowing about the quality of the water. Id. at 22-23, 35-36.

Finally, Kurt Limbach, who owns a home and land overlooking the Conemaugh River downstream from the CGS and has been a member of the Sierra Club since 1986 and PennEnvironment since 2002, testified that he uses the Conemaugh River principally for kayaking but has done some hiking along its banks; that he would like to fish but is afraid to take the fish from the river; that there are stretches of the river downstream from the Conemaugh Station where there is no sign of any life at all; that the rocks are covered with a nasty orange film that permanently stains any clothes that come into contact with it; and that he does not see any water birds foresting in the Conemaugh except in a few isolated areas where there is clean water coming into the river. Def. Exh. 6: Limbach Dep., pp. 4, 26, 27-28, 29-30, 34, 35, 51-2; Pls.' Int. Resp., No. 8; Masur Dep., pp. 18, 40. Mr. Limbach also indicated that his property values are adversely impacted by the degradation of the Conemaugh. Id. at p. 31.

In the Court's view, this testimony adequately supports a finding that, for these members of the plaintiff associations, the aesthetic value and recreational use of the Conemaugh

River has been lessened by the pollutants discharged into the river and demonstrates their concerns about the effects of that discharge. Indeed, the testimony from Messrs. Neatrour, Burk and Limbach all but mirror that set forth in Friends of the Earth, Inc. v. Laidlaw Environmental Services, 528 U.S. at 180-85, which the Supreme Court found was sufficient to demonstrate an injury in fact for purposes of standing.[7] See id. at 184-85 ("[W]e see nothing 'improbable' about the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river would cause nearby residents to curtail their recreational use of the waterway and would subject them to other economic and aesthetic harms"). See also Interfaith Community Organization v. Honeywell International, Inc., 399 F.3d at 256.

Having established that the plaintiffs' members have suffered an injury in fact, plaintiffs must also demonstrate that their injuries are "fairly traceable" to RRI's actions. Lujan v. Defenders of Wildlife, 504 U.S. at 560-61. Plaintiffs do not need to prove "to a scientific certainty that defendants' effluent, and defendants' effluent alone, caused the precise harm suffered by plaintiffs." Public Interest Research Group v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 72 (3d Cir. 1990) ("Powell Duffryn"), quoting Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 78 (1978). Rather, to meet the "fairly traceable" requirement plaintiffs need only show that "there is a 'substantial likelihood' that defendant's conduct caused the plaintiffs' harm." Id., quoting Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. at 75 n.20. See Interfaith Community Organ. v. Honeywell International, 399 F.3d at 257. See American Littoral Society v. U.S. Environmental Protection

---

[7]Indeed, RRI itself has conceded that "certain of Plaintiffs' allegations have been held to constitute aesthetic 'injuries in fact' in other cases . . . ." Def. Brief, p. 33.

Agency Region, 199 F. Supp. 2d 217, 232 n.9 (D.N.J. 2002) (finding that the traceability requirement is designed to make sure "that a genuine nexus exists between a plaintiff's injury and a defendant's alleged illegal conduct").

The Court of Appeals for the Third Circuit has found that in cases brought under the CWA, "substantial likelihood" may be established "by showing that a defendant has 1) discharged some pollutant in concentrations greater than allowed by his permit 2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and that 3) this pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs." Powell Duffryn, 913 F.2d at 72. The Court elaborated stating that:

> This will require more than showing a mere exceedance of a permit limit. Thus if a plaintiff has alleged some harm, that the waterway is unable to support aquatic life for example, but failed to show that defendant's effluent contains pollutants that harm aquatic life, then plaintiffs would lack standing.

Id. at 72-73.

Here, RRI does not dispute that it is discharging harmful pollutants into the Conemaugh River in excess of its NPDES permit limits or that plaintiffs have an interest that may be adversely affected by the pollutants but, rather, contends that plaintiffs are unable to establish that the metals it discharges into the river cause or contribute to the kind of injuries complained of.

Plaintiffs, however, have alleged in the complaint, that:

29. Selenium is a highly toxic metal. Even at concentrations as low as 3 to 8 parts per billion in water (or 0.003 to 0.008 milligrams per liter), selenium can cause reduced survival of juvenile fish. In addition, selenium can bioaccumulate in plants and invertebrates consumed by waterfowl and adversely affect the reproductive success of waterfowl.

23

*     *     *

35. Boron is an element present in coal. It is water soluble and can bioaccumulate in aquatic plants. Waterfowl that ingest boron and boron compounds have been found to suffer adverse effects on growth and reproduction.

*     *     *

41. Manganese is a metal used in the production of iron and steel. Although it is essential for human health in trace amounts, it becomes toxic at higher concentrations. Manganese can be acutely toxic to some aquatic organisms even at low concentrations.

*     *     *

47. The presence of aluminum is an important determinant of the toxicity of acidic waters to freshwater fish. Aluminum targets the gills, skeleton and kidneys of fish, among other organs. Certain aluminum compounds can bioaccumulate in fish and potentially be toxic when consumed by humans. Dissolved aluminum can also be toxic to other aquatic organisms.

*     *     *

53. Excessive concentrations of iron cause discoloration of river water and sediments, an effect that has been observed in the Conemaugh River. In addition, excessive concentrations of iron can reduce the amount of dissolved oxygen available to macroinvertebrates and impede the recovery of an impaired river like the Conemaugh.

*     *     *

59. Mercury is a highly toxic metal. Once deposited into streams and rivers, mercury can be readily transformed into methylmercury through microbial activity. Methylmercury accumulates in fish at levels that may be harmful to the fish and to animals and humans that consume them. The effects of methyl mercury exposure on wildlife can include mortality, reduced fertility, and slower growth and development. For fetuses, infants, and children, the primary health effect of methylmercury is impaired neurological development.

These allegations, if accepted as true, clearly support a finding that the selenium, boron,

manganese, aluminum, iron and mercury being discharged into the Conemaugh River by RRI can

24

cause the injuries of which plaintiffs complain.  See Powell Duffryn, 913 F.2d at 72.  See also

Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149 (4th Cir. 2000) (a

plaintiff need not "pinpoint[] the origins of particular molecules,"but must "merely show that a

*defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged* in the

specific geographical area of concern").  RRI has not disputed any of these assertions or

presented any evidence that would call them into question.  Moreover, RRI does not dispute that

these assertions provide the "dots" linking plaintiffs' injuries to the metals RRI discharges into

the Conemaugh River that the Court previously found lacking.  As such, the Court finds that

plaintiffs have demonstrated that there is a substantial likelihood that RRI's conduct has caused

the plaintiffs' harm and, thus, the traceability requirement has been met.[8]  See Powell Duffryn,

913 F.2d at 72.

     Having established the first two elements of standing the remaining issue is

whether it is likely that plaintiffs' injuries will be redressed by a favorable decision.  Lujan v.

Defenders of Wildlife, 504 U.S. at 560-61.  Here, the Court finds that both the injunctive relief

and the civil penalties sought by plaintiffs are more than likely to redress their injuries.

---

[8]Although RRI has submitted the Declaration of Thomas R. Teitt [ECF No. 35-3], Director of
Water and Wastewater for Reliant Energy Corporate Services, in support of its argument that plaintiffs
are unable to satisfy the traceability requirement because it discharges less of these metal into the
Conemaugh River than it takes out resulting in a net reduction of pollutants, the Court is unpersuaded.
Mr. Teitt's Declaration, which plaintiffs justifiably object to as being fraught with uncertainties and other
evidentiary problems, see Pls.' Brief, pp. 6-8 [ECF No. 41], does not negate the fact that RRI is
discharging pollutants into the river in excess of its permit limits or that these metals *can* cause the harm
experienced by plaintiffs.  Because under Powell Duffryn, all that is required to meet the traceability
element is a showing that the pollutants at issue can cause or contribute to the kinds of injuries alleged,
plaintiffs have satisfied their burden for purposes of standing.

Indeed, noting that the purpose of the CWA is to restore chemical, physical and biological integrity to the nation's waterways, the Court of Appeals for the Third Circuit has held that:

> Where a plaintiff complains of harm to water quality because a defendant exceeded its permit limits, an injunction will redress that injury at least in part. If [defendant] complies with its permit, the pollution in the [river] will decrease. Plaintiffs need not show that the waterway will be returned to pristine condition in order to satisfy the minimal requirements of Article III.

Powell Duffryn, 913 F.2d at 73. See 33 U.S.C. § 1251(a)(1). The Court also found a connection between the plaintiff's injuries and the civil penalties requested observing that:

> Where Congress has expressly granted a right of action and plaintiffs have shown "a distinct and palpable injury," plaintiffs "may invoke the general public interest in support of their claim." *Warth v. Seldin*, 422 U.S. 490, 501, 95 S. Ct. 2197, 2206. The general public interest in clean waterways will be served in this case by the deterrent effect of an award of civil penalties. Penalties will deter both [defendant] specifically and other NPDES permit holders generally. Thus [plaintiff's] members' injuries may be redressed by a favorable decision in this case. *See Student Public Interest Group of New Jersey, Inc. v. AT & T Bell Laboratories*, 617 F. Supp. 1190, 1200-01 (D.N.J. 1985).

Powell Duffryn, 913 F.2d at 73. The Court therefore concluded that plaintiff had met the constitutional requirements of standing. Id. See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), 528 U.S. 167, 185 -86 (2000) (finding that civil penalties afforded redress to citizen plaintiffs recognizing that "all civil penalties have some deterrent effect," and that it was Congress' intent that civil penalties in Clean Water Act cases deter future violations as well as promote immediate compliance).

In this case, like in <u>Powell Duffryn</u>, an injunction will certainly redress, at least in part, the harm to the water quality of which plaintiffs complain since, if RRI complies with the permit requirements, there will be less pollution in the Conemaugh River. Moreover, the imposition of civil penalties is not only likely to deter RRI from exceeding its permit levels in the future but will serve to deter others as well.

RRI's arguments to the contrary are not persuasive particularly as it has cited no authority in support thereof. Whether or not RRI is already taking steps to come into compliance is of little significance as it has not been in compliance with the 2001 Permit since it became effective in February of 2002. In addition, RRI's conclusion that imposing civil penalties will not provide them with any further incentive because it is already obligated to achieve compliance is not only self-serving but overlooks the deterrent effect of civil penalties. Whether or not RRI is already obligated to achieve compliance does not alter the fact that awarding civil penalties will not only arguably serve to deter RRI from committing future violations but will deter other NPDES permit holders from committing similar violations. As such, the Court finds that plaintiffs' injuries will be redressed by a favorable decision and that plaintiffs' members have satisfied all three constitutional standing requirements.

As previously discussed, in order for an organization itself to have standing to sue on its own behalf it must demonstrate that: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. Having found that the plaintiffs' members have standing to sue, it follows that the organizational plaintiffs have met the first prong of their standing requirements.

With respect to the second and third prongs, RRI does not dispute that the interests plaintiffs seek to protect are germane to their purposes or that it will be unnecessary for the individual members to participate in the lawsuit. Indeed, as argued by plaintiffs, the relief sought does not require individualized proof and plaintiffs do not seek individualized damages. Under these circumstances, plaintiffs have met the requirements of associational standing as well.

IV.    Conclusion

Based on the foregoing, Defendant's Motion to Dismiss [Dkt. 34] is DENIED. An appropriate order will follow.

/ s/ *Amy Reynolds Hay*
United States Magistrate Judge

Dated: 28 September, 2010

cc:    All counsel of record by Notice of Electronic Filing