IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PENNENVIRONMENT and          )
SIERRA CLUB,                 )
                Plaintiffs,  )
                             )
        vs.                  )     Civil Action No. 07-475
                             )     Magistrate Judge Robert C. Mitchell
GENON NORTHEAST MANAGEMENT   )
COMPANY,                     )
                Defendant.   )

## MEMORANDUM AND ORDER

MITCHELL, Magistrate Judge

Plaintiffs commenced this citizen suit against defendant GenOn Northeast Management Company ("GenOn"),[1] in an effort to secure GenOn's compliance with the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251, *et seq*, and the Pennsylvania Clean Streams Law ("PCSL"), 35 Pa. C.S. §§ 691.1, *et seq.* Plaintiffs allege that GenOn has been discharging illegal levels of at least five different metals into the Conemaugh River from Outfalls 003 and 007 at its Conemaugh Generating Station ("CGS") in West Wheatfield Township, Pennsylvania, in violation of its wastewater discharge limits.

I.      Background

It is undisputed that GenOn discharges industrial wastewater into the Conemaugh River and, consequently, that it is subject to the National Pollutant Discharge Elimination System

---

[1] Although Reliant Energy Northeast Management Company was originally named as the defendant in this action, it subsequently changed its name to RRI Energy Northeast Management Company and, in December of 2010, changed it again to GenOn Northeast Management Company. The caption of the case has been amended accordingly and, as such, defendant will be referred to hereon as "GenOn." See ECF No. 93; 12/09/2010 Text Order.

("NPDES"), a federal program established in section 402 of the CWA, 33 U.S.C. § 1342, to regulate the discharge of such pollutants. It is also undisputed that the Pennsylvania Department of Environmental Protection ("PADEP"), administers the NPDES in Pennsylvania, and that on December 27, 2001, the PADEP approved GenOn's renewal application for a NPDES Permit, authorizing GenOn's CGS to release wastewater into the Conemaugh River subject to certain effluent standards and limitations and monitoring requirements. ECF No. 97-3. The 2001 Permit was to become effective on February 1, 2002, and was to expire on December 27, 2006. Id.

On January 31, 2002, GenOn filed an appeal with the Pennsylvania Environmental Hearing Board ("PAEHB"), challenging some of the 2001 Permit requirements. On December 28, 2004, GenOn and the PADEP entered into a Consent Order and Agreement ("COA"), settling the appeal. ECF Nos. 98-4; 99-1. Amongst other things, the COA modified the compliance schedule set forth in the 2001 Permit giving GenOn until February 1, 2011 to comply with the final water-quality based effluent limitations ("WQBELs") listed in the COA. In addition, the PADEP was required to publish an amendment to the 2001 Permit in the *Pennsylvania Bulletin* and, after time for review and comment, issue an amended permit incorporating the terms and conditions set forth in the COA. The proposed amendment was, in fact, published in the *Pennsylvania Bulletin* on December 18, 2004, and on January 31, 2005, an amended permit was issued. ECF Nos. 98-5; 98-2. Since that time, according to GenOn, it has been performing studies and collecting data in order to assess potential treatment technologies and support the development of proposed revised effluent limitations. ECF No. 106, pp. 4-6.

Nevertheless, on February 6, 2007, Plaintiffs submitted a notice of intent to sue to GenOn, the PADEP and the Environmental Protection Agency ("EPA") in accordance with section 505 of the CWA, 33 U.S.C. § 1365, and commenced the instant action on April 10, 2007. In the interim, on April 5, 2007, the PADEP filed a civil action against GenOn under the PCSL in the Court of Common Pleas of Indiana County, Pennsylvania, alleging that between February of 2002 and October of 2006, GenOn was discharging wastewater into the Conemaugh River contrary to the CWA and/or the terms and conditions of the 2001 Permit. Amongst other things, the PADEP asked the court for injunctive relief and to assess civil penalties against GenOn. ECF No. 100-6. On May 3, 2007, pursuant to a joint motion filed by the parties, an order staying all proceedings in this case was entered to allow the parties to explore settlement; it appears undisputed that a similar order was also entered in the state court action. ECF Nos. 15; 100-7. Although settlement discussions ultimately proved unsuccessful, the PADEP nevertheless withdrew the state action on October 1, 2008. ECF No. 100-8. The stay of proceedings entered by this Court was lifted on November 25, 2008. ECF No. 27.

On March 13, 2009, GenOn filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) arguing that Plaintiffs' citizen suit is barred under section 309(g)(6) of the CWA and that Plaintiffs lack standing. ECF No. 34. In a Memorandum Opinion issued on December 18, 2009, the Court rejected GenOn's argument that Plaintiffs' suit was barred under the CWA but nevertheless granted GenOn's motion finding that Plaintiffs are without standing to pursue this action. ECF No. 51. Plaintiffs subsequently filed a motion for reconsideration of that finding arguing that the Court misapplied the standard applicable to 12(b)(1) motions and that, had the proper standard

been utilized, the Court would have concluded that Plaintiffs had standing and that the Court had jurisdiction over the matter. The Court was persuaded by Plaintiffs' argument and, consequently, vacated its December 22, 2010 Memorandum Opinion and issued an amended Memorandum Opinion on October 8, 2010, denying GenOn's motion to dismiss. ECF No. 81.

Plaintiffs filed a motion for partial summary judgment on December 15, 2010, which is presently before the Court. ECF No. 94.

II.  <u>Standard of Review</u>

Summary judgment is warranted only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating to the court that there is an absence of evidence to support the non-moving party's case. <u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 322 (1986). <u>See</u> <u>Conoshenti v. Public Service Electric & Gas Company</u>, 364 F.3d 135, 140 (3d Cir. 2004). When the moving party has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The mere existence of some evidence favoring the non-moving party, however, will not defeat the motion. There must be enough evidence with respect to a particular issue to enable a reasonable jury to find in favor of the non-moving party. <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986). <u>See</u> <u>McGreevy v. Stroup</u>, 413 F.3d 359, 363-64 (3d Cir. 2005). In evaluating the evidence at the summary judgment stage, the court must view the facts in the light most favorable

to the non-moving party and draw all reasonable inferences in its favor. <u>Matreale v. New Jersey</u> <u>Dept. of Military & Veterans Affairs</u>, 487 F.3d 150, 152 (3d Cir. 2007).

III.     <u>Discussion</u>

Plaintiffs have filed a motion seeking summary judgment solely on the issue of liability. Plaintiffs argue that because the evidence establishes that the Court has subject matter jurisdiction, that they continue to have standing to pursue the matter, and that GenOn continues to discharge wastewater into the Conemaugh River in excess of its 2001 Permit levels, it is strictly liable under the CWA.

With respect to this Court's subject matter jurisdiction, the CWA provides that:

> Except as provided in subsection (b) of this section and section 1319(g)(6) of this title, any citizen may commence a civil action on his own behalf . . . who is alleged to be in violation   of . . . an effluent standard of limitation under this chapter ....

> The district courts shall have jurisdiction . . . to enforce such an effluent standard or limitation . . . and to apply any appropriate civil penalties under section 1319(d) of this title.

33 U.S.C. § 1365(a).   Under subsection (b):

> No action may be commenced . . .

> **(A)** prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or

> **(B)** if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right

33 U.S.C. § 1365(b). Plaintiffs contend, and GenOn does not dispute, that it is properly considered a "person" under the CWA and that the violations at issue, *i.e.*, violations of a NPDES permit, fall within the ambit of the citizen's suit provision. Nor does GenOn dispute that Plaintiffs provided the requisite notice to GenOn, the EPA and the DEP more than 60 days before they commenced this action, see 33 U.S.C. §§ 1362(5), 1365(f), or that neither the EPA nor the DEP is "diligently prosecuting" an action in a court of the United States or a State to require GenOn's compliance with the 2001 Permit. Thus, it appears clear, that section (b) does not bar the instant suit or serve to deprive this Court of jurisdiction. See Proffitt v. Rohm & Haas, 850 F.2d 1007, 1011 (3d Cir. 1988) (finding that the plaintiff's action satisfies the statutory prerequisites because the requisite sixty-day notice was sent and neither the EPA nor Pennsylvania were diligently prosecuting an action in court).

GenOn nevertheless reiterates its argument that Plaintiffs' citizens suit is barred under 33 U.S.C. § 1319 (g)(6)(A)(ii), which precludes a citizen's suit from going forward where "a State has commenced and is diligently prosecuting an action under a State law comparable to this subsection." GenOn argues that because the DEP has been diligently working with it to come into compliance with the Permit limitations, as evidenced by the COA, that section 309(g)(6) applies and deprives this Court of jurisdiction.

GenOn's argument, however, has already been fully analyzed and rejected by the Court. See ECF Nos. 81, pp. 6-18; 91, p. 3. Specifically, this Court has found that, by its plain language, section 1319(g)(6)(A)(ii) precludes citizen suits when the state has commenced and is diligently prosecuting an action under a State law comparable to *this subsection*," *i.e.*, one that which provides for the assessment of administrative penalties. The COA, however, was not the result of an action commenced by the state but, rather, was an agreement that GenOn and the DEP entered

into to resolve the appeal *filed by GenOn* in which it contested the terms of the 2001 Permit.

Moreover, the COA, however, does not assess administrative penalties against GenOn and, thus, §

1319(g)(6)(A)(ii) does not apply and does not act as a jurisdictional bar to Plaintiffs' suit.[2]

GenOn alternatively argues that the Court should nevertheless abstain from exercising

jurisdiction because the matter is not only within the DEP's primary jurisdiction but that the

Burford abstention doctrine applies.

"The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative

remedies, is concerned with promoting proper relationships between the courts and administrative

agencies charged with particular regulatory duties." Rariten Baykeeper, Inc. v. NL Industries,

Inc., 713 F. Supp. 2d 448, 455 (D.N.J. 2010), quoting U.S. v. Western Pac. R. Co., 352 U.S. 59, 63

(1956).

> Abstention under the doctrine of primary jurisdiction is appropriate where
> "the matter involves technical or policy considerations which are beyond the
> court's ordinary competence and within the agency's field of expertise."
> *MCI Commc'n Corp. v. Am. Telephone & Telegraph Co.*, 496 F.2d 214, 220
> (3d Cir. 1974). "The Third Circuit has stated that the doctrine applies when
> decision-making 'is divided between courts and administrative agencies
> [and] calls for judicial abstention in cases where protection of the integrity of
> a regulatory scheme dictates primary resort to the agency which administers
> the scheme.' " *Global Naps, Inc. v. Bell Atlantic-New Jersey, Inc.*, 287 F.
> Supp. 2d 532, 549 (D.N.J. 2003) (*quoting Cheyney State Coll. Faculty v.
> Hufstedler*, 703 F.2d 732, 736 (3d Cir. 1983)).

Id. Although some courts have found that the doctrine is inapplicable to citizen suits brought

pursuant to the CWA, see L.E.A.D. (Lead Environmental Awareness Development) v. Exide

---

[2]Although the COA contemplates stipulated penalties should GenOn fail to comply with the COA, such penalties for future violations of a negotiated order, are clearly not the type of penalties contemplated under section 1319(g)(6). Not only does section 1319(g) generally speak to violations that have already occurred but any penalties that may be sought in the future are necessarily not now being "diligently prosecuted." See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49, 63 n.4 (1987 ); Knee Deep Cattle Co. v. Bindana Investment Co., 94 F.3d 514, 516-17 (9th Cir. 1996) (stipulated penalties for violations of negotiated consent order do not trigger section 1319(g)(6)).

Corp., 1999 WL 124473 at *21 (E.D. Pa. Feb. 19, 1999) ("L.E.A.D."), others have weighed the following factors in determining whether the doctrine applies:

> (1) [w]hether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) [w]hether the question at issue is particularly within the agency's discretion; (3) [w]hether there exists a substantial danger of inconsistent rulings; and (4) [w]hether a prior application to the agency has been made.

Id., quoting Global Naps, Inc. v. Bell Atlantic-New Jersey, Inc., 287 F. Supp. 2d 532, 549 (D.N.J. 2003).

Here, GenOn argues that this court should abstain for exercising jurisdiction because: 1) achieving compliance with the NPDES Permit implicates technical and policy considerations including judgments about the technical feasibility of achieving compliance; 2) the issues are well within the DEP's administrative discretion; and 3) there is a clear danger that adjudication of Plaintiffs' claims here would lead to inconsistent rulings and irreconcilable obligations since the injunction sought by Plaintiffs would interfere with GenOn's obligations under the COA. GenOn also sites to its continuing interaction with the DEP pursuant to the COA arguing that they are addressing the precise issues raised in this lawsuit thereby satisfying the fourth factor. The Court disagrees.

First, the issue before the Court is whether GenOn is in violation of its NPDES Permit limits which does not require the Court to make any determinations involving technical or policy considerations. L.E.A.D., 1999 WL 124473 at * 21-22. See Public Research Interest Group of New Jersey v. Star Enterprise, 771 F. Supp. 655, 666 (D.N.J. 1991) ("To determine whether Star has violated its permit, this court will have no need to resolve issues "within the special competence" of NJDEP . . . . The court will not be called on to set, modify or revoke the effluent

limits governing Star or to consider technical issues rightly left to the NJDEP") (internal citation omitted); Student Public Interest Research Group of New Jersey, Inc. v. Fritzsche, Dodge & Olcott, Inc., 579 F. Supp. 1528, 1537 (D.N.J. 1984), aff'd, 759 F.2d 1131 (3d Cir. 1985) ("the determination as to whether defendant's own monitoring reports reveal permit violations is fully within the Court's competence and jurisdiction"). Indeed, the DEP has already made those determinations when it set the Permit limits which the Court need only enforce. See Public Research Interest Group of New Jersey v. Star Enterprise, 771 F. Supp. at 666.

Second, although enforcing environmental laws is certainly within the DEP's discretion, it is clear that Congress intended that federal courts have jurisdiction over these types of cases when it enacted the citizen suit provisions. L.E.A.D., 1999 WL 124473 at * 22. See 33 U.S.C. § 1365(b).

Finally, as found by the court in L.E.A.D., "there is no substantial danger of inconsistent rulings or a risk of interfering with federal and state administrative oversight because Congress has expressly set forth situations in which a citizen suit is precluded for those reasons under the CWA." L.E.A.D., 1999 WL 124473 at 22. See 33 U.S.C. § 1365(b)(1). To the extent that GenOn contends that this suit is precluded under this provision of the CWA, the Court has already rejected those arguments. As such, notwithstanding the DEP's on-going efforts to bring GenOn into compliance, there is no basis to abstain from this Court's "virtually unflagging obligation" to exercise the jurisdiction granted to it. Hi Tech Trans, LLC v. New Jersey, 382 F.3d 295, 303 (3d Cir. 2004), quoting Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976). See Chez Sez III Corp. v. Township of Union, 945 F.2d 628, 630 (3d Cir. 1991) ("[a]bstension from the exercise of jurisdiction is appropriate only under certain limited circumstances").

Nor is abstention warranted under the Burford abstention doctrine.   Under Burford, "a federal court should refuse to exercise its jurisdiction in a manner that would interfere with a state's efforts to regulate an area of the law in which state interests predominate and in which adequate and timely state review of the regulatory scheme is available."   Hi Tech Trans, LLC v. N.J., 382 F.3d at 303, quoting Chiropractic America v. Lavecchia, 180 F.3d 99, 104 (3d Cir. 1999).   See Burford v. Sun Oil Co., 319 U.S. 315, 332-34 (1943).   Thus,

> [w]here timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the exercise of "federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

Hi Tech Trans, LLC v. N.J., 382 F.3d at 304, quoting New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans, 491 U.S. 350, 361 (1989) (internal quotations and citations omitted).

In the instant case, it does not appear that abstention under Burford is warranted.   There is no difficult question of state law; to the contrary, the controlling issue, i.e., whether GenOn has violated CWA by exceeding its NPDES Permit effluent limitations, is one of federal law. Further, whether or not GenOn is found to have violated its NPDES Permit limits by this Court, that determination will have no bearing on the DEP's policies or implicate its ability to develop a regulatory scheme.   See Interfaith Community Organization Inc. v. PPG Industries, Inc., 702 F. Supp. 2d 295, 309 (D.N.J. 2010) ("The mere fact that a state agency has taken some action on the waste at issue here does not make this Court's subsequent involvement a disruptive intrusion into the state's capacity to create a coherent policy").   See also New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans, 491 U.S. 350 at 361-64.

Indeed, any number of courts have held that the Burford abstention doctrine does not apply to citizen suits brought under the CWA at all, finding that "the CWA ... [is a] pervasive system[] of federal regulation where the parameters of state regulation are explicitly carved out by the federal system," and that "Congress has not designated the state as the exclusive repository of authority or expertise." L.E.A.D., 1999 WL 124473 at * 21-22.  See Ohio Valley Environmental Coalition, Inc. v. Apogee Coal Co., 531 F. Supp. 2d 747, 758-59 (S.D.W. Va. 2008); Louisiana Environmental Action Network v. LWC Management Co., 2007 WL 2491360 at *7-8 (W.D. La. Aug. 14, 2007); Community of Cambridge Environmental Health and Development Group v. City of Cambridge, 115 F. Supp. 2d 550, 560-61 (D. Md. 2000); Culbertson v. Coats American, Inc., 913 F. Supp. 1572, 1578 (N.D. Ga. 1995) (The considerations underlying Burford abstention simply do not apply to a scheme that contemplates citizen suits as a supplement to state government action); Natural Resources Defense Council, Inc. v. Outboard Maine Corp., 692 F. Supp. 801, 810 (N.D. Ill. 1988); Student Public Interest Research Group of New Jersey v. P.D. Oil & Chem. Storage, Inc., 627 F. Supp. 1074, 1085 (D.N.J. 1986); Wiconisco Creek Watershed Ass'n v. Kocher Coal Co., 646 F. Supp. 177, 179 (M.D. Pa. 1986); Brewer v. City of Bristol, 577 F. Supp. 519, 524 (E.D. Tenn. 1983); United States v. Cargill, Inc., 508 F. Supp. 734, 746-47 (D. Del. 1981).  See also Public Interest Research Group of New Jersey v. Witco Chemical Co., 1990 WL 66178 at *7-8 (D.N.J. May 17, 1990).[3]  We find, therefore, that Burford abstention is inapplicable to this case.

---

[3] Moreover, Raritan Baykeeper, Inc. v. NL Industries, Inc., 713 F. Supp. 2d 448 (D.N.J. 2010), the sole case relied upon by GenOn, is the only case uncovered by the Court in which the Burford abstention doctrine was applied to a citizen suit brought under the CWA.  Thus, not only has every court that has decided the issue disagreed with Raritan but, as found by those courts, Raritan's holding significantly depreciates the fact that Congress intended for citizen suits to supplement state government action.  See Proffitt v. Rohm & Haas, 850 F.2d at 1011-12.  See also U.S. v. Cargill, Inc., 508 F. Supp. at 747 ("Any state laws and regulations have been enacted in order to meet specific requirements contained in that federal law, and state authority can be removed altogether . . . .").

Finally, notwithstanding the Courts' previous finding that Plaintiffs have standing to maintain this action, GenOn takes issue with Plaintiffs' present argument that their status in this regard remains unchanged. GenOn, however, offers no additional arguments or evidence to support its position that was not already considered by the Court.[4] See ECF Nos. 35, pp. 31-39; 106, pp. 13-17; 81, pp. 18-28.

The Court has recognized that generalized grievances shared by the public at large are insufficient to confer standing on individual plaintiffs, Public Interest Research Group of New Jersey, Inc. v. Magnesium Elektron, Inc., 123 F.3d 111, 120 (3d Cir. 1997), but has nevertheless found that the testimony of David M. Neatrour, Michael Burk and Kurt Limbach regarding the injuries they have suffered as a result of the pollutants being discharged into the Conemaugh River, all but mirrors that set forth in Friends of the Earth, Inc. v. Laidlaw Environmental Services, 528 U.S. 167, 180-85 (2000), which the Supreme Court found sufficient to demonstrate an "injury in fact" for purposes of standing.[5] See id. at 184-85 ("[W]e see nothing 'improbable' about the proposition that a company's continuous and pervasive illegal discharges of pollutants into a river

---

[4] It is undisputed that Article III of the Constitution limits the jurisdiction of federal courts to "cases and controversies," which in turn, requires that "plaintiffs must have standing to sue." Interfaith Community Organization v. Honeywell International, Inc., 399 F.3d 248, 254 (3d Cir. 2005). In order to demonstrate standing the plaintiff must have suffered an "injury in fact;" the injury has to be "fairly ... trace[able] to the challenged action of the defendant;" and it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (internal citations omitted). See Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc., 528 U.S. at 180-81; Interfaith Community Organization v. Honeywell International, Inc., 399 F.3d at 254-55.

[5] The complaints testified to by Messrs. Neatrour, Burk and Limbach include a general uneasiness about the water; observations that the water is discolored, turbid, greenish, and brackish; that it tastes and smells metallic; that the rocks are stained with an orange film; that there are activities, including wading, canoeing, paddling, fishing, bird watching, and herb collecting, that they hesitate to engage in or avoid altogether, because of concern about the toxicity and potential threat to their health; observations regarding a difference in the distribution of river otters between the upstream and downstream reaches of the Conemaugh, the absence of water birds and that in some areas there is no sign of any life at all. ECF No. 101-5, pp. 7, 8, 10-15, 20; ECF No. 101-6, pp. 8-10, 14; ECF No. 101-7, pp. 6-11. Moreover, GenOn itself has conceded that "certain of Plaintiffs' allegations have been held to constitute aesthetic 'injuries in fact' in other cases . . . ." ECF No. 35, p. 36.

would cause nearby residents to curtail their recreational use of the waterway and would subject them to other economic and aesthetic harms").

Having established that the Plaintiffs' members have suffered an injury in fact, Plaintiffs must also demonstrate that their injuries are "fairly traceable" to GenOn's actions. Lujan v. Defenders of Wildlife, 504 U.S. at 560-61. Plaintiffs do not need to prove "to a scientific certainty that defendants' effluent, and defendants' effluent alone, caused the precise harm suffered by plaintiffs." Public Interest Research Group v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 72 (3d Cir. 1990) ("Powell Duffryn"), quoting Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59, 78 (1978). Rather, to meet the "fairly traceable" requirement plaintiffs need only show that "there is a 'substantial likelihood' that defendant's conduct caused the plaintiffs' harm." Id., quoting Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. at 75 n.20. See Interfaith Community Organ. v. Honeywell International, 399 F.3d at 257; American Littoral Society v. U.S. E.P.A. Region, 199 F. Supp. 2d 217, 232 n.9 (D.N.J. 2002) (finding that the traceability requirement is designed to make sure "that a genuine nexus exists between a plaintiff's injury and a defendant's alleged illegal conduct").

The Court of Appeals for the Third Circuit has found that in cases brought under the CWA, "substantial likelihood" may be established "by showing that a defendant has 1) discharged some pollutant in concentrations greater than allowed by his permit 2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and that 3) this pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs." Powell Duffryn, 913 F.2d at 72. The Court elaborated stating that:

> This will require more than showing a mere exceedance of a permit limit. Thus if a plaintiff has alleged some harm, that the waterway

> is unable to support aquatic life for example, but failed to show that defendant's effluent contains pollutants that harm aquatic life, then plaintiffs would lack standing.

Id. at 72-73.

Here, GenOn's does not dispute that it is discharging harmful pollutants into the Conemaugh River in excess of its NPDES permit limits or that Plaintiffs have an interest that may be adversely affected by the pollutants but, rather, contends that Plaintiffs are unable to establish that the metals it discharges into the river cause or contribute to the kind of injuries complained of.

Plaintiffs, however, have submitted the following documentary evidence which clearly indicates that the pollutants at issue cause or can contribute to the kinds of injuries testified to by Plaintiffs:

> 1. A report issued by the EPA setting forth guidance for water quality standards and recommended water quality criteria for selenium. The guidance report indicates that, although selenium is "nutritionally essential," it can be toxic to aquatic life where the concentrations are excessive.[6] The guide specifically states that "[f]or aquatic life, the toxic effects with the lowest thresholds are effects on the growth and survival of juvenile fish and effects on larval offspring of the adult fish that were exposed to excessive selenium. In the latter case, besides reducing survival, selenium causes skeletal deformities." It also states that risks to birds that eat aquatic organisms have been observed and that there can be risks to humans who consume fish or drink water that contains high levels of selenium. See ECF No. 100-10, p. 2.

> 2. A Biological Report issued by the U.S. Fish and Wildlife Service in response to information requests from environmental specialists in which available data on boron in the environment, with an emphasis on fishery and wildlife resources, is summarized. The report indicates that toxic levels of Boron usually occur as the result of human activity such as coal combustion and adversely affect the growth rate and tissue residue of waterfowl.

---

[6] GenOn's NPDES Permit defines "toxic pollutant" as one that "after discharge and upon exposure, ingestion, inhalation, or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will … cause death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions, including malfunctions in reproduction, or physical deformations in such organisms or their offspring." EFC No. 98-2, p. 38.

Although representative species of aquatic plants, invertebrates, fishes and amphibians can usually tolerate up to 10 mg/1 of Boron without negative effects, concentrations of less than 0.1 mg have been found to affect reproduction in rainbow trout. It was also reported that one study showed that concentrations of 100 to 300 mg/1 killed all species of aquatic vertebrates tested. See ECF No. 100-13.

3. A report prepared by the EPA establishing Total Maximum Daily Loads ("TMDLs"), or the amount of a pollutant that a waterbody can assimilate without exceeding its water quality standard for that pollutant, for streams impaired by acid mine drainage ("AMD") in the Kiskiminetas-Conemaugh River Watershed.[7] The report indicates that the AMD in the Kiskiminetas-Conemaugh River Watershed negatively affects fish populations. ECF No. 100-14, p. 6.

4. An earlier report created by the PADEP discussing the impacts of mine drainage on aquatic life. The report indicates that iron, aluminum and manganese are the most common heavy metals that can increase the toxicity of mine drainage and act as "metabolic poisons," decreasing the tolerance of certain fish to acidic water. Specifically, the report states that iron lowers the pH of the water and makes it corrosive and "unable to support many forms of aquatic life;" that "[i]mpacted uses include recreational uses, scenic resource appreciation, aquatic organism habitat and can be toxic to vegetation;" that little animal life can be found in streams with a low pH and elevated iron levels; that iron and aluminum hydroxides "decrease oxygen availability as they form; the precipitate may coat gills and body surfaces, smother eggs, and cover the stream bottom, filling in crevices in rocks, and making the substrate unstable and unfit for habitation by benthic organisms;" that aluminum is the most damaging to aquatic life and, in concentrations greater than 0.5 mg/1 where the pH is less than 5.5, "will generally eliminate all fish and many macroinvertebrates;" that precipitated aluminum coats the stream substrate causing slippery surfaces that, in turn, makes it difficult for insects to maintain position in the current and can be directly toxic to macroinvertebrates and to fish by accumulating on fish gills so as to interfere with their breathing and blocking surfaces important for respiratory exchange in invertebrates. ECF No. 100-15, pp. 2-4. With respect to manganese, the report indicates that the metal causes "objectionable discoloration" at concentrations as low as 0.2 mg/1 and that one study showed that precipitated manganese hydroxide formed a black coating over the substrate of a Pennsylvania stream receiving mine drainage. Another study showed that manganese tolerance limits for fish vary widely and that "the lowest toxic

[7] The EPA established the TMDLs at the request of the PADEP, which is required to develop TMDLs under the CWA. ECF No. 100-14, p. 3.

concentrations were reported in watersheds with very low levels of hardiness." ECF No. 100-15, p. 6.

5. An EPA report entitled "The toxicity of aluminum to aquatic species in the US," which indicates that aluminum is acutely toxic to freshwater vertebrate at concentrations of 0.46 mg/1 and to aquatic plants at concentrations of 0.46 mg/1. As well, the toxicity to aquatic animals increases as the pH decreases. The report also states that chronic exposure aluminum at concentrations of 0.35 mg/1 was 100% lethal to striped bass after seven days exposure and 48% lethal to brook trout after sixty days. ECF No. 101-1, p. 2.

6. A fact sheet issued by the Public Health Service Agency for Toxic Substances and Disease Registry of the U.S. Department of Health and Human Services which states that, although consuming trace amounts of manganese is necessary to stay healthy, exposure to excessive amounts, which can occur from breathing air (particularly where manganese is used in manufacturing), drinking water and eating food, can cause brain damage. It also states that the most common health problem manifested in workers exposed to high levels of manganese involve the nervous system, causing movements to become slow and clumsy, and behavioral changes; some workers have experienced slowed hand movements even when exposed to lower concentrations. Oral consumption of high amounts of manganese has also been seen to cause nervous system and reproductive effects in animals. ECF No. 101-2, pp. 1, 2.

7. A 2003 report issued by the EPA on "Ecological Soil Screening Level for Iron" indicating that the concerns regarding iron flocculation include "unsightliness, staining, and its effect on the taste of potable water." The EPA also states that although iron itself is not considered toxic "it is environmentally significant because of its interaction with metals that are toxic," and that its interaction with manganese effects plant metabolism. ECF No. 101-3, p. 4.

In the Court's view, this evidence amply supports Plaintiffs' contention that the pollutants discharged into the Conemaugh River from GenOn's CGS causes or can contribute to the kinds of harms complained of by Plaintiffs and, thus, there is a substantial likelihood that GenOn's conduct has caused the Plaintiffs' injuries. It appears therefore that Plaintiffs have satisfied the "traceability" element of the standing analysis. See Powell Duffryn, 913 F.2d at 72. See also Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 161 (4th Cir. 2000) (a

plaintiff need not "pinpoint[] the origins of particular molecules," but "must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographical area of concern").[8]

GenOn, however, objects to the admissibility of Plaintiffs' evidence as unsworn admissible hearsay excludable under Fed. R. Evid. 801-804; as involving scientific or specialized knowledge without a proper foundation and excludable under Fed. R. Evid. 702; and/or as irrelevant under Fed. R. Evid. 401-402 because the statements have no bearing on the condition of the Conemaugh River of CGS's discharges. GenOn's objections are without merit.

Because Plaintiffs are required to demonstrate that the pollutants GenOn discharges into the River can cause or contribute to the types of harms complained of in order to establish standing, the relevance of evidence regarding the harms these pollutants pose appears obvious. See Public Interest Research Group of New Jersey v. Powell Duffryn Terminals, Inc. 913 F.2d at 72. See also Public Interest Research Group of New Jersey v. Hercules, Inc., 2003 WL 23519620 at *7-8 (D.N.J. Oct. 27, 2003). Further, these reports all appear to be public records and reports generated by public agencies setting forth their activities and/or factual findings as the result of an investigation made pursuant to their authority granted by law and, thus, are admissible under Fed. R. Evid. 803(8)(A) & (C) as exceptions to the hearsay rule. See Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 161-62, 170 (1988); Coates v. AC and S, Inc., 844 F. Supp. 1126, 1132-33 (E.D. La.

---

[8] Although GenOn states in its brief that it "removes a significant amount of these metals from the river," suggesting that there is actually a net reduction of pollutants being discharged into the river, ECF No. 106, p. 16, the Court has already found that the Declaration of Thomas R. Teitt, Director of Water and Wastewater for Reliant Energy Corporate Services, upon which GenOn relies, ECF No. 35-3, is not only fraught with evidentiary problems but does not negate the fact that GenOn is discharging pollutants into the river in excess of its permit limits or that these metals can cause the harm experienced by plaintiffs. ECF No. 81, p. 25 n.8. Because under Powell Duffryn, all that is required to meet the traceability element is a showing that the pollutants at issue can cause or contribute to the kinds of injuries alleged, Plaintiffs have satisfied their burden for purposes of standing.

1994); United States v. Davis, 826 F. Supp. 617, 621-22 (D.R.I. 1993); Conde v. Velsicol Chemical Corp., 804 F. Supp. 972, 993 (S.D. Ohio 1992), aff'd, 24 F.3d 809 (6th Cir. 1994). See also 33 U.S.C. § 1311 (b)(2)(A).

Moreover, the authors of these reports need not be qualified as experts in order for the reports to be admissible under Rule 803(8) as it is presumed that government officials will perform their duties properly and that their reports are accurate and reliable. Coleman v. Home Depot, Inc., 306 F.3d 1333, 1341 (3d Cir. 2002); Complaint of Munyan, 143 F.R.D. 560, 563 (D.N.J. 1992). Hence, any challenge to the trustworthiness of these reports must be accompanied by evidence that would impugn their reliability. Clark v. Clabaugh, 20 F.3d 1290, 1294-95 (3d Cir. 1994), quoting Melville v. American Home Assur. Co., 584 F.2d 1306, 1316 (3d Cir.1978) ("We have held that '[b]efore [an objection to the opinion testifier's expert qualifications] may be recognized . . . the party challenging the validity of an official report admitted under 803(8)(C) must come forward with some evidence which would impugn its trustworthiness'"). Further, as found by the Court of Appeals for the Third Circuit, this reading of Rule 803(8) also applies to Rule 702, which provides a means of testing an expert's reliability. Melville v. American Home Assur. Co., 584 F.2d at 1316. Specifically, the Court has found that "[t]o allow objections to be sustained under Rule[] 702 . . . without a showing of untrustworthiness would have the practical effect of nullifying the exception to the hearsay rule provided by Rule 803(8)(C)." Id. Thus, GenOn's objections to the admissibility of the agency reports submitted by Plaintiffs are only sustainable if accompanied by evidence that would call the trustworthiness of these reports into question. GenOn has not presented any such evidence and, thus, the reports are properly considered.

With respect to the third prong of the standing analysis, this Court has previously found that the injunction sought by Plaintiffs would redress, at least in part, the harm to the water quality of which Plaintiffs complain since, if GenOn complies with the permit requirements, there will be less pollution in the Conemaugh River. The Court has also found that the imposition of civil penalties is not only likely to deter GenOn from exceeding its permit levels in the future but will serve to deter others as well. See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), 528 U.S. at 185-86 (finding that civil penalties afforded redress to citizen plaintiffs as "all civil penalties have some deterrent effect," and that it was Congress' intent that civil penalties in Clean Water Act cases deter future violations as well as promote immediate compliance); Powell Duffryn, 913 F.2d at 73 (finding that plaintiff's members' injuries would be redressed by an injunction which, if complied with, would decrease the pollution in the river, and by civil penalties which would deter both the defendant and other NPDES permit holders).

In so finding, the Court necessarily rejected GenOn's arguments to the contrary since whether or not GenOn is already taking steps to come into compliance is of little significance as it has not been in compliance with the 2001 Permit since it became effective in February of 2002. In addition, GenOn's conclusion that imposing civil penalties will not provide them with any further incentive because it is already obligated to achieve compliance is not only self-serving but overlooks the deterrent effect of civil penalties. Whether or not GenOn is already obligated to achieve compliance does not alter the fact that awarding civil penalties will not only arguably serve to deter GenOn from committing future violations but will deter other NPDES permit holders from committing similar violations. GenOn has not presented any new arguments in this regard nor offered any additional evidence to warrant a contrary conclusion and, thus, the Court finds that Plaintiffs continue to have standing.

19

Having found that the Court has subject matter jurisdiction over this matter, that Plaintiffs have standing and that neither the Burford abstention doctrine or the primary jurisdiction doctrine compels the Court to abstain from adjudicating this case on the merits, the only remaining question is whether the evidence supports a finding that GenOn has violated the CWA by exceeding its NPDES Permit discharge limits for iron, aluminum, manganese, boron and selenium from Outfalls 003 and 007 at its CGS.

The Third Circuit has held that "a discharge that is not in compliance with a permit 'is the archetypal Clean Water Act violation, and subjects the discharger to strict liability.'"   United States v. Allegheny Ludlum Corp., 366 F.3d 164, 175 (3d Cir. 2004), quoting United States v. Pozsgai, 999 F.2d 719, 725 (3d Cir. 1993).   See Natural Resources Defense Council, Inc. v. Loewengart & Co., 776 F. Supp. 996, 998 (M.D. Pa. 1991), citing Public Interest Research Group v. Powell Duffryn Terminals Inc., 913 F.2d at 68, 73 n. 10 ("the Clean Water Act imposes strict liability.   All the plaintiff need do is establish that the defendant violated the terms of its NPDES permit").   See also 33 U.S.C. § 1319(d) ("Any person who violates . . . any permit condition . . . shall be subject to a civil penalty") (emphasis added).   A citizen plaintiff, however, must establish that the violations were "ongoing" at the time the complaint was filed which may be demonstrated "either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations."   Natural Resources Defense Council, Inc. v. Texaco Refining and Marketing, Inc., 2 F.3d 493, 501 (3d Cir. 1993), quoting Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd., 844 F.2d 170, 171-72 (4th Cir. 1988).

Here, Plaintiffs have argued that they are entitled to summary judgment because GenOn's own monitoring data establishes that its Permit violations are "ongoing." Indeed, according to the 2001 Permit, the relevant effluent discharge limitations for outfalls 003 and 007 are as follows:

| OUTFALL | POLLUTANT | DAILY MAX. LIMIT | MONTHLY AVG. LIMIT |
|---------|-----------|------------------|--------------------|
| 003 | Aluminum | 2.2 mg/l | 1.1 mg/l |
| 003 | Manganese | 3.2 mg/l | 1.6 mg/l |
| 003 | Iron | 3.4 mg/l | 1.7 mg/l |
| 007 | Selenium | 0.5 mg/l | 0.25 mg/l |
| 007 | Boron | 200 mg/l | 100 mg/l |
| 007 | Manganese | 3.2 mg/l | 1.6 mg/l |

ECF No. 97-3, pp. 10, 23-24.[9] The Discharge Monitoring Reports ("DMRs"), which GenOn is required to submit, and which it has certified are accurate under penalty of law, indicate that GenOn exceeded the daily maximum concentration limit for manganese 7 times, aluminum 36 times, and iron 61 times at Outfall 003 between February of 2005 through October of 2010. They also show that the monthly average concentration limits for these metals during the same time frame was exceeded 19, 42, and 68 times, respectively. With respect to Outfall 007, the DMRs show that between February 2005 and October 2010, GenOn exceeded the daily maximum concentration limit for selenium 15 times, boron 69 times and manganese 63 times; the monthly average concentration limits for these metals exceeded was 34, 69, and 62 times, respectively.[10]

---

[9] Although the 2001 Permit was amended in 2005, the relevant discharge limitations remained unchanged. See ECF No. 98-2, pp. 10, 23-24. See also ECF Nos. 96 ¶¶ 14-18; 105 ¶¶ 14-18.

[10] Plaintiffs have not only provided all of the relevant DMRs submitted by GenOn but have also offered a table summarizing the pertinent information contained therein. See ECF Nos. 99-3 through 100-1; ECF No. 100-3. GenOn does not dispute the accuracy of the DMRs and, with the exception of one entry in which Plaintiffs understated the daily concentration of iron being discharged, has admitted to the accuracy of Plaintiffs' table. See ECF Nos.

It appears clear from these reports that GenOn has been continuously violating the discharge limitations of the 2001 Permit both before and after April 10, 2001 -- the date on which the complaint was filed.   ECF No. 1.   See United States v. Allegheny Ludlum Corp., 366 F.3d 176 (recognizing that "courts should treat DMRs, which must be certified by the discharger, as admissions that are sufficient to establish liability under the CWA").   As such, Plaintiffs have established GenOn's liability under the CWA.

Although GenOn recites its efforts over the years to come into compliance with permit requirements and states in the fact section of its brief that it achieved full compliance with applicable WQBEL levels at Outfall 003 at the end of 2010, it does not address Plaintiffs' argument that it has continually violated its permit levels since 2005, nor has it offered any evidence to dispute that its discharges of iron, aluminum and manganese from Outfall 003 exceeded its NPDES Permit limitations for 3,587 days before and after the complaint was filed or that it exceeded its effluent limits for boron, manganese and selenium from Outfall 007 for 5,097 days during the same time frame.[11]   GenOn therefore is liable under the CWA for violation of its Permit limitations for a total of 8,684 days.

---

100-2; 99-2, pp. 3-4.   See also ECF 96, ¶¶ 37, 38; ECF No. 105, ¶¶ 37, 38.   Moreover, although GenOn objects to Plaintiffs' categorization of these discharges as "violations" because the COA refers to the effluent limitations set forth in the 2001 Permit simply as "goals," Plaintiffs argue, and GenOn does not dispute, that the COA does not purport to modify or amend the discharge limits in the 2001 Permit.   ECF Nos. 105, ¶ 38; 99-1, pp. 19, 33.   Indeed, the 2005 amendment states that it is only amending the 2001 Permit in fourteen enumerated ways - none of which change the WQBELs at Outfalls 003 and 007 - and that the "remainder of the permit is in full force and effect."   ECF No. 98-2, p. 4.   Indeed, neither the proposed amendment that was published in the Pennsylvania Bulletin nor the amended permit that was actually issued in January 31, 2005, alter the effluent limitations as set forth in the 2001 Permit for Outfalls 003 and 007.   ECF Nos. 98-5, pp. 5, 7; 98-2, pp. 7-10, 21-24; 97-3, pp. 7-10, 21-24.   Under these circumstances, it appears that GenOn's ongoing discharges at levels in excess of those allowed under the 2001 Permit constitute "violations."

[11] Plaintiffs have represented, and GenOn does not dispute, that each exceedance of a daily maximum limit for each pollutant at each outfall constitutes a separate "day of violation," and that for violations of monthly average limits, each exceedance for each pollutant at each outfall constitutes as many "days of violation" as the number of days on which GenOn actually discharged wastewater from that outfall during the month.   In its 2006 Permit renewal

IV.     Conclusion

       Accordingly, this 21st day of March, 2011, Plaintiffs' Motion for Partial Summary

Judgment on liability [ECF No. 94] is GRANTED.   An appropriate Order shall follow.


                                        /s/ Robert C. Mitchell_____
                                        United States Magistrate Judge


cc:     All counsel of record by Notice of Electronic Filing

---

application GenOn reported that it discharges wastewater from Outfall 003 six days per week or, using an average of
27 days per month, 320 days per year.   From Outfall 007, GenOn discharges wastewater seven days per week or 365
days per year.   ECF No. 97-2.   As such, GenOn is in violation of its Permit limits for 3,587 days at Outfall 003, and
for 5,097 days at Outfall 007.